Deborah Rosenthal (SBN 184241)
drosenthal@simmonsfirm.com
SIMMONS BROWDER GIANARIS ANGELIDES
    & BARNERD LLC
455 Market Street, Suite 1150
San Francisco, California 94105
Phone: (415) 536- 3986 / Fax: (415) 537- 4120

*[Additional counsel listed on signature page]*

Attorneys for Plaintiffs, Vicki and Richard Sutcliffe, and all others similarly situated

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKI AND RICHARD SUTCLIFFE, on behalf of themselves and all others similarly situated, | Case No.: CV11 6595 <br> Assigned to: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| - against - | 1. Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* |
| WELLS FARGO BANK, N.A., a national bank, for itself and d/b/a WELLS FARGO HOME MORTGAGE, a division of Wells Fargo Bank, N.A.; and DOES 1-100, inclusive, | 2. Breach of Contract / Implied Covenant of Good Faith and Fair Dealing <br> 3. Rescission and Restitution |
| Defendant. | **JURY TRIAL DEMANDED** |

### INTRODUCTION

1.     This case arises from fraudulent, unfair, and unconscionable debt collection practices whereby Defendants, mortgage loan servicers and mortgagees, induce borrowers facing foreclosure to enter into illusory trial loan modification and forbearance programs with the hope that they will be offered permanent loan modifications.     Defendants had and have no intention of offering such loan modifications, however; permanent modifications are either denied outright or offered on terms so substantially similar to the unmodified mortgage as to render any

1 such modification illusory. The trial modification proposals are offered to induce the
2 homeowner into making thousands of dollars of additional payments that could not
3 otherwise be collected, after which Defendants foreclose anyway.

4      2.      In the current climate of falling home prices and increasing numbers of
5 foreclosures, Defendants are well aware that when they do foreclose, in all
6 likelihood, the home will sell for less than the amount owed on the mortgage. Many,
7 if not most homeowners, will be unable to pay the deficiency. Moreover, in
8 California, where Defendants have their principal place of business and where the
9 misconduct originated, a home lender is precluded from proceeding against a
10 homeowner for the deficiency. By inducing the homeowner to make payments under
11 a trial loan modification proposal, Defendants in effect are able to collect a portion of
12 the deficiency before the foreclosure.

13      3.      In addition, loan servicers are paid by and beholden to the investors
14 that hold the principal and interest rights to the loans they service. The larger the
15 face-value of the pools a servicer services, the more it makes. Moreover, for loans in
16 default, past due, and/or on the brink of foreclosure, a servicer may make more
17 money in fees. As a result, it is in the servicer's interest to have loans in default and
18 arrears for as long as possible prior to foreclosure, and then to foreclose. In fact,
19 servicers like Defendants stand only to lose revenue by giving loan modifications to
20 borrowers instead of foreclosing. But, as already noted, it is in the servicer's interest
21 to delay foreclosure when by doing so it can collect additional sums from distressed
22 borrowers prior to the foreclosure.

23      4.      Defendants' use of illusory loan modification proposals is fraudulent
24 and deceptive, and violates California's Unfair Competition Law.

25      5.      Defendants have offered illusory trial modification and forbearance
26 proposals to thousands of homeowners facing foreclosure with a common pattern:
27 homeowners whose loans cannot and will not be modified are induced to make
28 thousands of dollars in payments, then are told that no modification will be

-2-

1 forthcoming; then their homes are sold in a trustee sale or their mortgages are
2 foreclosed. Plaintiffs are such homeowners. They bring this action on behalf of
3 themselves and a nationwide class of all other homeowners victimized by Defendants
4 in this way.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C.
§ 1332(d), because the matter in controversy exceeds $5,000,000 and this is a class
action on behalf of a nationwide class in which at least one member of the class is a
citizen of a State different from the State of which the Defendants are citizens.

7. This Court has personal jurisdiction over the Defendants because they
maintain their principal places of business in the state of California, and transact
and/or regularly do business in California.

8. Venue is proper in this judicial district because Defendants do
substantial business in this judicial district and some of the acts complained of
occurred in this judicial district.

## PARTIES

9. Plaintiffs Vicki and Richard Sutcliffe ("the Sutcliffes") are a married
couple residing in Kansas City, Missouri. The Sutcliffes are the borrowers under a
note (the "Sutcliffe Note") evidencing a loan (the "Sutcliffe Loan"), and the Grantors
under a Deed of Trust (the "Sutcliffe Deed of Trust"), relating to a home in Kansas
City. The original lender under the Sutcliffe Note and the Sutcliffe Deed of Trust
was Wells Fargo Home Mortgage.

10. Defendant Wells Fargo Bank, N.A. is a national banking association
with its principal place of business in San Francisco, California. Wells Fargo Home
Mortgage is a division of Wells Fargo Bank, N.A. Wells Fargo Bank, N.A. and
Wells Fargo Home Mortgage are sometimes referred to hereafter as, simply, "Wells
Fargo" or "Defendants."

11. Plaintiffs are not aware of the true names and capacities of the

-3-

1  defendants sued as Does 1-100, inclusive, and therefore sue these defendants by such
2  fictitious names. Each of these fictitiously named defendants is responsible in some
3  manner for the activities alleged in this Complaint. Plaintiffs will amend this
4  Complaint to add the true names of the fictitiously named defendants once they are
5  discovered.

6      12.     Plaintiffs allege on information and belief that at all times relevant
7  hereto each of the defendants, including each DOE, was the agent, principal, servant,
8  master, employee, employer, joint-venturer, partner, successor-in-interest, and/or co-
9  conspirator of each other defendant and was at all times acting in the full course and
10 scope of said agency, service, employment, joint venture, concert of action,
11 partnership, successorship, or conspiracy, and that each defendant committed the
12 acts, caused or directed others to commit the acts, or permitted others to commit the
13 acts alleged in this Complaint.

14                           **SUBSTANTIVE ALLEGATIONS**

15 **The Foreclosure Crisis**

16     13.     Over the last three years, the United States has been in a foreclosure
17 crisis. In 2009, a congressional oversight panel found that one in eight mortgages in
18 the United States is currently in foreclosure or default.

19     14.     In testimony before the United States Senate Subcommittee on
20 Administrative Oversight and the Courts of the Committee on the Judiciary on July
21 23, 2009, Alys Cohen of the National Consumer Law Center testified as follows:

22         Goldman Sachs estimates that, starting at the end of the last quarter of
           2008 through 2014, 13 million foreclosures will be started. The Center
23         for Responsible Lending, based on industry data, predicts 2.4 million
           foreclosures in 2009, and a total of 9 million foreclosures between
24         2009 and 2012. At the end of the first quarter of 2009, more than 2
           million houses were in foreclosure. Over twelve percent of all
25         mortgages had payments past due or were in foreclosure and over
           seven percent were seriously delinquent - either in foreclosure or more
26         than three months delinquent. Realtytrac recently reported that an
           additional 300,000 homes go into foreclosure every month. These
27         spiraling foreclosures weaken the entire economy and devastate the
           communities in which they are concentrated. Neighbors lose equity;
28         crime increases; tax revenue shrinks.

                                          -4-

1    15.    Economists have predicted that interest rate resets on the riskiest of
2 lending products would or did not reach their zenith until sometime in 2011.
3 Additional foreclosures can be expected.

4    16.    All 50 attorneys general for the states have either independently pursued
5 or joined in an investigation into the foreclosure practices of banks and loan servicers
6 like Defendants. The Attorney General of Arizona, for example, remarked:

7           What I'm most angry about is the simultaneous modifications and
            foreclosures. . . . We need to look for a stipulated judgment in all 50
8           states, that if someone is in modification, they can't be foreclosed.

9    17.    Here, Defendants' customers are led to believe that they are being
10 considered for possible loan modifications on terms they will be able to afford.
11 Instead, Defendants simply take their money and foreclose anyway.

12    **How Defendants Benefit From Illusory Loan Modification Proposals**

13    18.    Under the laws of many states, by electing to foreclose, Defendants lose
14 the right to collect any amount owed on the loan that exceeds the amount recovered
15 through the foreclosure process. Thus, when a home is worth less than the amount
16 owed - which has become all too common in the foreclosure crisis -- after foreclosure
17 the borrower does not have to repay, and Defendants have no means to collect, any
18 arrearage or missed payments on the loan(s). Importantly, once a foreclosure has
19 been initiated, a borrower has no legal obligation to make payments on the loan and
20 the lender has no legal ability to collect any such payments.

21    19.    Even in states that permit a deficiency judgment, the likelihood of
22 collection of any deficiency judgment is quite small, so that lenders have the same
23 incentive to extract as much money as possible before foreclosing.

24    20.    If Defendants can dupe distressed borrowers into making payments on a
25 loan which is already in default, then foreclose, Defendants and their investors reap a
26 windfall in fees and interest that they would otherwise waive through foreclosure.
27 This is precisely what Defendants accomplish through their use of illusory loan
28 modification proposals.

21. Defendants' use of illusory loan modifications is an attempt improperly to collect deficiency judgments that they are barred from collecting.

22. In her testimony before Congress, Alys Cohen explained why loan servicers do not want their customers to qualify for loan modifications:

> Creating affordable and sustainable loan modifications for distressed homeowners on a loan-by-loan basis is labor intensive. Under many current pooling and servicing agreements, additional labor costs incurred by servicers engaged this process are not compensated by the loan owner. By contrast, servicers' costs in pursuing a foreclosure are compensated. In a foreclosure, a servicer gets paid before an investor; in a loan modification, the investor will usually continue to get paid first. Under this cost and incentive structure, it is no surprise that servicers continue to push homeowners into less labor-intensive repayment plans, non-HAMP loan modifications, or foreclosure.

23. Economic factors that encourage Defendants to offer illusory trial loan modifications include the following:

(a) Defendants may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of lingering default until foreclosure.

(b) The monthly service fee that the servicer Defendants collect as to each loan it services in a pool of loans is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

(c) Fees that Defendants charge borrowers that are in default constitute a significant source of revenue. Aside from income Defendants directly receive, late fees and process fees are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

(d) Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the

1    unpaid principal and interest payment of a non-performing loan. The

2    servicer's right to recover expenses from an investor in a loan modification,

3    rather than a foreclosure, is often less clear and less generous.

4    24.    For these reasons, when Defendants offer an illusory loan modification

5    proposal, they have an incentive to draw out as long as possible the trial period

6    before they deny the permanent modification, in order to delay the ultimate

7    foreclosure and maximize the amount of money improperly collected under the

8    pretense that a modification will be forthcoming.

9    **The Sutcliffe Loan**

10   25.    The Sutcliffe Loan was taken out on the subject property (the

11   "Property") in July 2006. The amount financed by the Sutcliffes to purchase the

12   Property was $140,000.   The Sutcliffes' monthly payments were approximately

13   $1,180.00 per month. The loan was serviced by Wells Fargo Home Mortgage.  They

14   paid Wells Fargo on time every month to the best of their ability.

15   26.    In 2009, however, Richard Sutcliffe's income was cut from $25 per hour

16   to $18 per hour, and his weekly hours cut to just 8-12 hours per week as the economy

17   in Missouri was severely hard-hit by the economic downturn.   Additionally, Vicki

18   Sutcliffe's medical expenses doubled monthly because her employer no longer paid

19   all of her health insurance coverage. As a result of this lost income and increase in

20   necessary expenses, the Sutcliffes could not afford the monthly payments on their

21   loan and asked Wells Fargo for a loan modification in order to remain in their home.

22   By January 2011, Richard Sutcliffe had been laid off from his job.

23   27.    In December, 2009, Wells Fargo sent the Sutcliffes a document entitled

24   "Home Affordable Modification Program Loan Trial Period" (the "Trial Plan").  The

25   Trial Plan set forth the terms pursuant to which Wells Fargo represented the

26   Sutcliffes would qualify for a Loan Modification Agreement that would permanently

27   modify the terms of their loan.

28   28.    In a section labeled "The Loan Trial Period," the Trial Plan provided for

-7-

1  the Sutcliffes to make three payments, on January 1, 2010, February 1, 2010, and

2  March 1, 2010, of $787.71 each.

3      29.    The Sutcliffes were instructed to, and did, make their payments to Wells

4  Fargo Home Mortgage at Suite L2-200, 1200 West 7th Street, Los Angeles,

5  California.

6      30.    The Trial Plan contained a section labeled "My Representations." This

7  section (Section 1) required the Sutcliffes to certify certain representations to the

8  lender:

9      A.    I am unable to afford my mortgage payments for the reasons
            indicated in my Hardship Affidavit and as a result, (i) I am
10           either in default or believe I will be in default under the Loan
            Documents in the near future, and (ii) I do not have sufficient
11           income or access to sufficient liquid assets to make the monthly
            mortgage payments now or in the near future;

12     B.    I live in the Property as my principal residence, and the Property
13           has not been condemned;

14     C.    There has been no change in the ownership of the Property since
            I signed the Loan Documents;

15     D.    I am providing or already have provided documentation for all
            income that I receive (and I understand that I am not required to
16           disclose any child support or alimony that I receive, unless I
            wish to have such income considered to qualify for the Offer);
17
      E.    Under penalty of perjury, all documents and information I have
18           provided to Lender pursuant to this Plan, including the
            documents and information regarding my eligibility for the
19           program, are true and correct; and

20     F.    If Lender requires me to obtain credit counseling, I will do so.

21     31.    The Trial Plan stated: "If I am in compliance with this Loan Trial

22  Period (the "Plan") and my representations in Section 1 continue to be true in all

23  material respects, then the Lender will provide me with a Loan Modification

24  Agreement. . . ." No other conditions on the loan modification were set forth in the

25  Trial Plan. On or before December 12, 2009, the Sutcliffes signed the Trial Plan and

26  returned it to Wells Fargo. As required by the Trial Plan, the Sutcliffes submitted a

27  Hardship Affidavit explaining the reasons that they were unable to make their

28  mortgage payments.

-8-

1    32.    All of the representations set forth in the Trial Plan, and all of the
2    statements in the Sutcliffes' Hardship Affidavit were true and remained true
3    throughout the life of their loan.

4    33.    The Sutcliffes faithfully and timely made all three payments under the
5    Trial Plan.    When Wells Fargo failed to send them the paperwork for their
6    modification at the end of the three-month period, the Sutcliffes continued to make
7    payments at the trial period amount, as they had been instructed to do.    The
8    Sutcliffes made payments at the trial period amount for 7 months, through July, 2010.
9    As a result of this prolonged "trial period," the Sutcliffes paid many thousands of
10   dollars while waiting to hear from Defendants about their modification.

11   34.    Although they had been instructed to continue making payments at the
12   trial period amount, on May 16, 2010, Wells Fargo sent the Sutcliffes a letter stating
13   that their loan was in default for failure to make payments due.  This letter bore a
14   return address for Wells Fargo Home Mortgage in Temecula, California.

15   35.    On June 2, 2010, Wells Fargo sent the Sutcliffes a letter stating that it
16   was "unable to adjust the terms of your mortgage under the Home Affordable
17   Modification Program," but that it would review their loan "for alternative loss
18   mitigation solutions and notify [them] separately of the results of that review."

19   36.    Wells Fargo denied the Sutcliffes a loan modification even though the
20   Sutcliffes had complied in all respects with the terms of the Trial Plan by making
21   each of the monthly payments required, and all of their representations to Wells
22   Fargo were, and remained true.  Under the terms set forth in the Trial Plan, those
23   were the only conditions for the Sutcliffes to be offered a bona fide loan
24   modification.

25   37.    On June 13, 2010, Wells Fargo sent the Sutcliffes another letter stating
26   that their loan was in default for failure to make payments due.  Like the May 16,
27   2010 letter, this letter bore a return address for Wells Fargo Home Mortgage in
28   Temecula, California.

-9-

1    38.    On July 19, 2010, a Wells Fargo representative sent the Sutcliffes a
2 letter notifying them that their request for "Repayment Agreement" had been denied,
3 but that there may be other alternatives to assist them, including loan modification.

4    39.    On July 28, 2010, the Sutcliffes received another letter from Wells
5 Fargo (the "Initial Forbearance Offer"), offering them a "Special Forbearance Plan"
6 whereby they would make three payments of $1,179.31 from August to October
7 2010. (This is referred to hereafter as the "Initial Forbearance Plan.")

8    40.    The Initial Forbearance Offer came nearly five months later than the
9 Trial Plan had suggested that a permanent modification decision would be
10 forthcoming. During that time, the Sutcliffes had continued to make their Trial Plan
11 payments, so that the Sutcliffes made 4 more payments than they had initially been
12 told would be necessary during the trial period.

13    41.    The Initial Forbearance Offer read in relevant part:

14       We have good news about the above referenced loan. Our goal is
         simple. We want to ensure you have every opportunity to retain your
15       home.    Based on our telephone conversation and the financial
         information you provided, we would like to offer you a Special
16       Forbearance Agreement ("Agreement").

17    42.    The Sutcliffes executed and returned the Initial Forbearance Offer
18 on August 19, 2010 and sent the first payment of $1,179.31 on August 26, 2010.
19 This payment was substantially equal to the Sutcliffes' original monthly mortgage
20 payment amounts. The Sutcliffes made two additional payments of $1179.31 on
21 September 29, 2010 and October 29, 2010.

22    43.    Because the first three (3) payments under the Initial Forbearance Plan
23 were substantially the same as the original monthly payments that the Sutcliffes
24 could not afford, the Sutcliffes' continued payments under the Initial Forbearance
25 Plan were essentially full mortgage payments made even after Wells Fargo had
26 declared the Sutcliffes' loan in default. These payments were substantially greater
27 than those offered under the Trial Plan and were merely a ruse – under the guise that
28 "alternative loss mitigation solutions" or "other alternatives," including loan

-10-

1  modification, would be extended – all to continue drawing payments from the
2  Sutcliffes even though Wells Fargo had no intention of modifying their mortgage.

3      44.    After making the new payment of $1,179.31 under the Initial
4  Forbearance Plan for the required three months, the Sutcliffes received letters dated
5  October 31, 2010 and November 28, 2010 stating that their loan was in default. Like
6  the May and June default letters, these letters bore a return address for Wells Fargo
7  Home Mortgage in Temecula, California. These letters also instructed the Sutcliffes
8  to forward certified funds to Wells Fargo Home Mortgage at 1200 West 7th Street,
9  Suite L2-200, Los Angeles, California.

10     45.    The Sutcliffes made additional payments of $693.14 on November 24,
11  2010 and $880.00 on December 28, 2010. These were amounts that the Sutcliffes
12  could afford to pay Wells Fargo at that time. The $880.00 payment was returned and
13  Plaintiff Vicki Sutcliffe was told by Wells Fargo not to make any additional
14  payments because they would be returned. No payments were made from January
15  2011 to March 2011.

16     46.    On January 4, 2011, the Sutcliffes received a letter from the law firm
17  Shapiro & Weisman, L.C., informing them that the law firm had been retained to
18  initiate foreclosure proceedings to foreclose the Deed of Trust. The Sutcliffes also
19  received a "Notice of Trustee's Sale" stating that the property would be sold at
20  auction on March 24, 2011. A January 3, 2011 letter from Wells Fargo confirmed
21  that the loan file had been sent to Wells Fargo's law firm with instructions to begin
22  foreclosure proceedings.

23     47.    Thereafter, on January 31, 2011, Vicki Sutcliffe sent a letter to Wells
24  Fargo asking them to reconsider the loan modification or "lowering the interest or
25  doing something so that I can afford the medical bills, medication, and be able to
26  remain in our home."

27     48.    On March 8, 2011, the Sutcliffes received another letter from Shapiro &
28  Weisman, L.C., setting out the reinstatement figures for the loan through March 23,

-11-

1  2011. Although the Sutcliffes had made payments on the Trial Plan and the Initial
2  Forbearance Plan through November 2010 (and had made a December 2010 payment
3  which was returned to them), the March 8 letter stated that the Sutcliffes' payments
4  were delinquent back to September 2010 and that their total owed was $9,930.93.

5       49.    On March 31, 2011, the Sutcliffes received a different letter, this time
6  from Wells Fargo, again offering them a "Special Forbearance Agreement" and
7  informing them that their loan was due for 7 installments from September 1, 2010
8  through March 1, 2011.   The March 31 letter made no mention of the amount
9  required or timeframe of payments.

10      50.    Thereafter, the Sutcliffes received substantially the same letter on April
11  15, 2011 (the "Second Forbearance Offer"), but this time the letter stated that the
12  amount to be paid each month would be $867.23 from April 2011 through July 2011.
13  The Sutcliffes signed the Second Forbearance Offer on May 3, 2011, but had begun
14  making the payments on April 22, 2011. (This is referred to hereafter as the "Second
15  Forbearance Plan."    Together, the Initial Forbearance Plan and the Second
16  Forbearance Plan are referred to hereafter as the "Forbearance Plans.")

17      51.    On April 7, 2011, the Sutcliffes had received a second "Notice of
18  Trustee's Sale" stating that the property would be sold at auction on May 2, 2011.
19  The Sutcliffes continued to make the payments of $867.23 from April 2011 through
20  July 2011.

21      52.    On July 19, 2011, Vicki Sutcliffe sent another letter to Wells Fargo
22  indicating once again their financial hardship, and informing them that it was now
23  their fourth time to finish out the same process with "no changes in their
24  circumstances sending in paperwork and payments on time and as instructed." The
25  Sutcliffes had sent the same paperwork in December 2009, November 2010 and
26  February 2011 prior to this most recent time in July 2011.

27      53.    In approximately July 2011, Plaintiff Vicki Sutcliffe was informed
28  that the Sutcliffes' file had been assigned to Wells Fargo case manager Sheryl

-12-

1 Oliver. Ms. Oliver instructed Plaintiff Vicki Sutcliffe to continue making the
2 $867.23 payment which the Sutcliffes have done and continue to make. The
3 Sutcliffes have made payments of $867.23 from April 2011 to the present. At all
4 times, the Sutcliffes have made all payments and complied with the terms of all
5 Trial Plan and Forbearance Plans, but Wells Fargo has not modified the Sutcliffes'
6 loan.

7     54.      As recently as a December 13, 2011 telephone call, Ms. Oliver of
8 Wells Fargo continued to request that Vicki Sutcliffe send additional updated and
9 current documentation, even though the Sutcliffes have complied with all terms of
10 the Trial Plan and the Forbearance Plans and have submitted complete and accurate
11 supporting documentation, and even though Wells Fargo has repeatedly notified the
12 Sutcliffes that their loan is in default and that a Trustee's Sale is imminent.

13     55.      Taken together, the Trial Plan, the instruction to continue making
14 monthly payments at the Trial Plan rate even after the Trial Plan's three months
15 expired, the Initial Forbearance Plan, the Second Forbearance Plan, and all
16 continuing inducements were part of a common scheme to induce Plaintiffs to
17 continue making payments under the guise that a permanent modification was
18 attainable, even though Defendants had no intention of modifying Plaintiffs' loan
19 and, indeed, simultaneously pursued default and foreclosure proceedings.

20     56.      Wells Fargo's headquarters and principal place of business are in
21 California, where much of the Wells Fargo communication with Plaintiffs either
22 originated or was directed. On information and belief, the common scheme
23 referred to herein was conceived, approved, and implemented from Defendants'
24 California headquarters, where many or most of Wells Fargo's executives maintain
25 their offices. The common scheme was carried out from Wells Fargo's California
26 headquarters, or at the direction of personnel based there.

27 **CLASS ALLEGATIONS**

28     57.      Plaintiffs bring this action as a class action on behalf of all homeowners

-13-

1  nationwide who received a trial loan modification proposal substantially similar to
2  the Trial Plan from any of the Defendants; made the payments set forth in the
3  proposal; provided true information with respect to all representations required by the
4  proposal; and were either (a) denied a permanent loan modification; (b) offered an
5  illusory "modification" on terms substantially similar to their unmodified loan;
6  and/or (c) who received, entered into, and complied with the above described
7  Forbearance Plans from Wells Fargo, consisting of the Offer Letter and Agreement,
8  in substantially the same form(s) presented to Plaintiffs.

9      58.    The class is ascertainable and is so numerous that joinder of all members
10  is impracticable.  Plaintiff does not know the exact number of class members, but
11  believes that the proposed class includes thousands of members.

12     59.    There are questions of law and fact common to the claims of all class
13  members.

14     60.    The common questions include, but are not limited to, the following:

15         (a)    Whether Defendants applied criteria or conditions for loan
16      modifications other than those set forth in Trial Plans offered to homeowners
17      who were behind in their payments;

18         (b)    Whether Defendants had actual criteria for mortgage loan
19      modifications and, if so, what those criteria were;

20         (c)    Whether Defendants had a practice of offering trial loan
21      modifications without any intention of actually modifying the loan in
22      question;

23         (d)    Whether Defendants' practice of denying loan modifications, or
24      offering illusory modifications, on bases other than those set forth in the
25      modification proposal and Defendants' conduct with respect to the
26      Forbearance Plans constituted "unlawful, unfair, or fraudulent business acts
27      or practices" within the meaning of Cal. Bus. & Prof. Code §§ 17200 *et seq.*,
28      and/or the consumer protection laws of other states.

-14-

(e) Whether the Trial Plans or Forbearance Plans were valid and binding agreements and whether Defendants had programs in place that constituted material performance of the Agreements;

(f) Whether Defendants' conduct with respect to the Trial Plans or Forbearance Plans subjects the agreements to rescission and restitution for failure of consideration under section 1688 of the California Civil Code;

61. The Sutcliffes' claims are typical of the claims of the other members of the Class. Plaintiffs, like all other members of the Class, have sustained damages arising from Defendants' violations of the laws, as alleged herein. The representative Plaintiffs and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair and unconscionable practices engaged in by Defendants.

62. The Sutcliffes will fairly and adequately represent and protect the interests of the Class members and have retained as counsel trial lawyers who are experienced and competent in complex and class action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class members.

63. This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual class members, while substantial, are small compared to the burden and expense of individual prosecution of the complex and very expensive litigation needed to address Defendants' conduct. Even if class members themselves could afford such individual litigation, the court system would be overwhelmed by the individual lawsuits. In addition, individualized litigation increases the delay and expense to all parties and to the court system

-15-

1 resulting from the complex legal and factual issues of this case. Individualized
2 litigation also presents a potential for inconsistent or contradictory judgments. By
3 contrast, the class action device presents far fewer management difficulties; allows
4 the hearing of claims which might otherwise go unaddressed because of the relative
5 expense of bringing individual lawsuits; and provides the benefits of single
6 adjudication, economies of scale, and comprehensive supervision by a single court.

7                                    **CLAIMS FOR RELIEF**

8                                   **FIRST CLAIM FOR RELIEF**

9                 **Violation of Unfair Competition Law ("UCL"), Cal. Bus. &**

10                                 **Prof. Code §§ 17200 *et seq*.**

11                            **(On Behalf of Plaintiffs and the Class)**

12      64.    Plaintiffs repeat and re-allege each and every allegation set forth in
13 paragraphs 1 through 63 above as if fully set forth herein.

14      65.    Defendants' acts and practices as described herein constitute
15 unlawful, fraudulent, and unfair business acts and practices, in that (a) the
16 justification for Defendants' conduct is outweighed by the gravity of the
17 consequences to Plaintiffs and members of the Class; and/or (b) Defendants' conduct
18 is immoral, unethical, oppressive, unscrupulous, unconscionable, or substantially
19 injurious to Plaintiffs and members of the Class; and/or (c) the uniform conduct of
20 Defendants has a tendency to deceive Plaintiffs and the members of the Class.

21      66.    Defendants' conduct is: (a) unlawful because it violates 15 U.S.C.
22 §§ 1692e and 1692f; (b) fraudulent because Defendants falsely represented that their
23 trial modification plans and modification proposals could prevent foreclosure and
24 falsely represented that borrowers would qualify for loan modifications solely
25 through the submission of true representations and the requested trial plan payments;
26 additionally fraudulent because the Forbearance Plans were intended to and likely did
27 mislead the public into believing that they could obtain an opportunity to retain their
28 homes; and (c) unfair because it offends legislative policy with regard to the use of

                                          -16-

1  fraudulent, deceptive, misleading, unfair and unconscionable means in the collection
2  of debts and further offends California's legislative policy set forth in Cal. Civil Code
3  §2923.5, which requires that the mortgagee contact the borrower prior to filing a
4  notice of default in order to "explore options for the borrower to avoid foreclosure."
5  This policy clearly requires *bona fide* efforts to assist borrowers to avoid foreclosure
6  and is violated by Defendants' false, deceptive, misleading, unfair, and
7  unconscionable use of trial modification plans and modification proposals that
8  pretend to offer a borrower an alternative to foreclosure but are in fact designed
9  merely to extract additional payments from the borrower before Defendants complete
10 their foreclosure proceedings.

11     67.     In particular, Defendants have falsely, deceptively, misleadingly,
12 unfairly, and/or unconscionably advertised to consumers or otherwise induced
13 consumers, including Plaintiffs, to make payments that Defendants could not
14 otherwise have collected and which would not otherwise have been collectible, by
15 pretending to offer trial and permanent loan modification programs, without any
16 good faith intention to modify the loan.

17     68.     Defendants have falsely, deceptively, misleadingly, unfairly, and/or
18 unconscionably advertised or otherwise induced consumers to make payments
19 pursuant to a "Trial Plan" or "Forbearance-to-modification" by falsely, deceptively,
20 or misleadingly representing that a permanent modification on similar terms would
21 be forthcoming.

22     69.     Defendants have falsely, deceptively, misleadingly, unfairly, and/or
23 unconscionably advertised or led consumers to believe that Defendants provide trial
24 modification plans with the false representation that the borrower need only meet two
25 conditions, payment of the trial period payments and submission of true
26 representations.  Using criteria other than those set forth in the Trial Plan, Defendants
27 have then failed to offer a bona fide permanent modification.

28     70.     The unfair and deceptive acts and practices of Defendants have directly,

-17-

1 foreseeably, and proximately caused or will cause damages and injury to Plaintiffs
2 and the members of the Class.

3    71.   The actions and failures to act of Defendants, and the above described
4 course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or
5 employment by Defendants of unconscionable commercial practices, deception,
6 fraud, false pretenses, misrepresentations, and the knowing concealment, suppression
7 or omission of material facts with the intent that others rely upon such concealment,
8 suppression, or omission of material facts in connection with the sale and or/leasing
9 of merchandise of Defendants in violation of the consumer protection statutes listed
10 above

11   72.   Plaintiffs have suffered injury in fact and have lost money or property as
12 a result of the conduct described herein.  Plaintiffs were induced by Defendants'
13 unlawful, fraudulent, and unfair conduct to make payments to Defendants totaling
14 thousands of dollars which they would not have made, and which could not lawfully
15 have been collected from them after foreclosure.

16   73.   By reason of the foregoing, Defendants are required to make restitution
17 and disgorge the monies they have unlawfully obtained through their unlawful,
18 fraudulent, and unfair practices, in an amount to be proved at trial.  Defendants are
19 obligated to pay (a) actual damages to the Sutcliffes and to the class in an amount to
20 be proved at trial; (b) punitive damages to the Sutcliffes and to the class; and
21 (c) attorneys' fees.

22                 **SECOND CLAIM FOR RELIEF**

23        **Breach of Contract/Implied Covenant of Good Faith and**

24                        **Fair Dealing**

25                **(On Behalf of Plaintiffs and the Class)**

26   74.   Plaintiffs repeat and re-allege each and every allegation set forth in
27 paragraphs 1 through 73 above as if fully set forth herein.

28   75.   Defendants' form "Home Affordable Modification Program Loan Trial

-18-

1   Period" is a contract between Defendants and the homeowners setting forth the terms
2   on which the homeowners will qualify for a Loan Modification Agreement.

3       76.    The form "Home Affordable Modification Program Loan Trial Period"
4   provides:  "If I am in compliance with this Trial Period Plan (the "Plan") and my
5   representations in Section 1 continue to be true in all material respects, then the
6   Lender will provide me with a Loan Modification Agreement. . . ."  No other
7   conditions on the loan modification are set forth.  Defendants agreed that if these
8   conditions were met, they would provide the Sutcliffes with a mortgage modification.

9       77.    The  Sutcliffes  fully  performed  under  the  "Home  Affordable
10  Modification Program Loan Trial Period" agreement, because they made the
11  requisite payments in compliance with the Trial Plan and because the representations
12  in Section 1 were and remained true.

13      78.    Notwithstanding Plaintiffs' full compliance with the terms of the Trial
14  Plan, Defendants did not provide a loan modification agreement.  This was a breach
15  of the agreement.

16      79.    Subsequently, Plaintiffs entered into Forbearance Plans offered by
17  Defendants pursuant to which Plaintiffs made additional monthly payments,
18  ostensibly to demonstrate Plaintiffs' willingness and ability to make reduced monthly
19  payments.

20      80.    The Sutcliffes fully performed all of their obligations under the
21  Forbearance Plans.

22      81.    Notwithstanding Plaintiffs' full compliance with the terms of the
23  Forbearance Plans, Defendants did not provide a loan modification, or any
24  opportunity for same.  This was a breach of the agreement.

25      82.    To the extent Wells Fargo claims that it reserved for itself the ultimate
26  discretion as to whether or not a modification would be offered, Wells Fargo has
27  breached the covenant of good faith and fair dealing implied in its agreements with
28  Plaintiffs.

83.     In every contract or agreement, including those at issue here, there is an implied promise of good faith and fair dealing, which means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. This covenant of good faith applies in particular here, where Defendants drafted an adhesive agreement whereby it ostensibly retained for itself the unfettered discretion to avoid its obligations under the agreement.   In such situations, the law reads a duty of good faith into Defendants' exercise of such discretion in order that the agreement should not be rendered illusory. Defendants exercised in bad faith their discretion under the "Home Affordable Modification Program Loan Trial Period" agreement by failing to offer the Sutcliffes a Loan Modification Agreement even though the Sutcliffes fully complied with the agreement. It was Defendants' practice to breach the "Home Affordable Modification Program Loan Trial Period" agreements it entered into with homeowners who sought loan modifications, because Defendants applied additional conditions and criteria for the grant of a loan modifications that were not set forth in the "Home Affordable Modification Program Loan Trial Period" agreement.

84.     Defendants also breached their contracts with Plaintiffs and/or violated the implied covenant of good faith and fair dealing with respect to the Forbearance Plans.   The Forbearance Plans were offered, ostensibly, so that Plaintiffs could demonstrate their willingness and an ability to make reduced monthly payments. Plaintiffs complied with their obligations under the Forbearance Plans in all respects. Defendants, however, had already declared Plaintiffs' loan in default, had no intention of entering into a loan modification agreement with Plaintiffs, and pursued foreclosure proceedings during the term of the Forbearance Plans.

85.     Defendants breached the implied covenant of good faith and fair dealing implicit in the overall scheme of inducing Plaintiffs to make Trial Plan period payments, to make continuing payments after the Trial Plan period expired, to make Initial Forbearance Plan payments, and to make Second Forbearance Plan payments,

-20-

1 during which Defendants exercised in bad faith their discretion as to whether or not
2 to offer a permanent loan modification.

3        86.    By reason of the foregoing, Defendants are obligated to pay damages to
4 Plaintiffs and the Class in an amount to be proved at trial, or, in the alternative, to
5 provide Plaintiffs with the loan modification promised in the "Home Affordable
6 Modification Program Loan Trial Period" agreement, and are entitled in the
7 alternative to damages to terminate the agreements with Defendants and to recover
8 their consideration paid under those agreements (i.e. their Trial Plan payments and
9 their forbearance payments) without formal rescission.

10                              **THIRD CLAIM FOR RELIEF**

11          **Rescission and Restitution - Cal. Civil Code §§ 1688-1689**

12                      **(On Behalf of Plaintiffs and the Class)**

13        87.    Plaintiffs repeat and re-allege each and every allegation set forth in
14 paragraphs 1 through 86 above as if fully set forth herein.

15        88.    NOTICE OF RESCISSION: In the alternative, Plaintiffs and Class, by
16 service of this Class Action Complaint on Defendant Wells Fargo, hereby provide
17 notice to Defendants, their subsidiaries and affiliates that the Trial Plans and the
18 Forbearance Plans described in this Complaint are subject to rescission and are
19 hereby rescinded for the reasons set forth herein.

20        89.    Section 1689(b) of the California Civil Code provides that a "party to a
21 contract may rescind the contract… (1) If the consent of the party rescinding . . . was
22 given by mistake, or obtained by duress, menace, fraud, or undue influence,
23 exercised by or with the connivance of the party as to whom he rescinds…. (2) If the
24 consideration for the obligation of the rescinding party fails, in whole or in part,
25 through the fault of the party as to whom he rescinds…. (4) If the consideration for
26 the obligation of the rescinding party, before it is rendered to him, fails in a material
27 respect from any cause."

28        90.    Plaintiffs are entitled to rescind all agreements pursuant to which they

                                          -21-

1  made continued payments to Wells Fargo under Civil Code § 1689(b) and to recover
2  their consideration paid thereunder because their consent to the agreements was
3  given by mistake, and/or obtained by duress, through fraud or through undue
4  influence exercised by Wells Fargo, and/or because the consideration promised by
5  Wells Fargo failed in a material respect and through the fault of Wells Fargo.

6      91.    Specifically, Wells Fargo represented that it had reviewed (or re-
7  reviewed) Plaintiffs' financial information, and on that basis was offering Plaintiffs
8  access to Trial Plans and Forbearance Plans that would give them the opportunity to
9  retain their home provided that they demonstrated an ability to make the reduced
10 payment for the time periods in question. Wells Fargo made these representations
11 with the intent of inducing Plaintiffs to enter into the Trial Plans and Forbearance
12 Plans in reliance thereon, and Plaintiffs did so rely in entering into the Trial Plans and
13 Forbearance Plans and making payments thereunder. Wells Fargo knew or should
14 have known based on the information available at the time that it had no program that
15 would have given Plaintiffs the opportunity to retain their home and/or no intention
16 or ability to enter into a permanent modification, and that the reduced payment it was
17 affirmatively proposing through the offer as a "trial" payment was not a payment that
18 it would be willing to accept on a long term basis.

19     92.    Plaintiffs have retained no consideration that must be tendered back to
20 Wells Fargo prior to rescission.

21     WHEREFORE, Plaintiffs pray for judgment and relief as set forth below.

22                          **PRAYER FOR RELIEF**

23     WHEREFORE Plaintiffs, on their own behalf and on behalf of the Class, pray
24 for relief as follows:

25     A. An order certifying the nationwide Class, appointing the named Plaintiffs and
26         their counsel to represent the Class;

27     B. An order rescinding and/or terminating the Trial Plan and the Forbearance
28         Plans;

-22-

1    C. An order requiring Defendants to disgorge and make restitution of monies

2       unlawfully obtained from Plaintiffs and the Class;

3    D. An order enjoining Defendants from continuing their false, deceptive,

4       misleading, unfair and unconscionable practices;

5    E. An order awarding Plaintiffs actual damages and punitive damages as well as

6       attorney's fees;

7    F. An order awarding Plaintiffs and the nationwide Class damages for

8       Defendants' breach of contract and/or the implied covenant of good faith and

9       fair dealing, or, in the alternative, ordering specific performance of each

10      "Home Affordable Modification Program Loan Trial Period" agreement that

11      Defendants entered into and breached;

12   G. An order awarding Plaintiffs and the Class interest and costs of this action,

13      including attorneys' fees; and

14   H. An order awarding Plaintiffs and the Class such other and further relief,

15      including additional equitable relief, as this Court may deem just and proper.

16

17   Dated: December 21, 2011

18                          **SIMMONS BROWDER GIANARIS ANGELIDES &**
                            **BARNERD LLC**
19

20                   By:
                            Deborah Rosenthal (SBN 184241)
21                          455 Market Street, Suite 1150
                            San Francisco, California
22                          drosenthal@simmonsfirm.com

23                          *Attorneys for Plaintiff and the Putative Class*

24

25

26

27

28

                                    -23-

1

## **Demand For Jury Trial**

2

Plaintiffs demand a trial by jury.

3

Dated: December 21, 2011

4

5        **SIMMONS BROWDER GIANARIS ANGELIDES & BARNERD LLC**

6

7        By: _____
         Deborah Rosenthal (SBN 184241)

8        455 Market Street, Suite 1150
         San Francisco, California

9        drosenthal@simmonsfirm.com

10       *Attorneys for Plaintiff and the Putative Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-

1  *Of Counsel:*

2

Paul J. Hanly, Jr. **(\*)**
3  phanly@hanlyconroy.com
Jayne Conroy **(\*)**
4  jconroy@hanlyconroy.com
Andrea Bierstein **(\*)**
5  abierstein@hanlyconroy.com
Mitchell Breit **(\*)**
6  mbreit@hanlyconroy.com
7  **HANLY CONROY BIERSTEIN SHERIDAN**
**FISHER & HAYES LLP**
8  112 Madison Ave., 7th Floor
New York, New York 10016
9  Tel: (212) 784-6401 (PJH)
10  Tel: (212) 784-6402 (JC)
Tel: (212) 784-6403 (AB)
11  Fax: (212) 213-5949

Derek Y. Brandt **(\*)**
dbrandt@simmonsfirm.com
Emily J. Kirk **(\*)**
ekirk@simmonsfirm.com
Anna M. Kohut **(\*)**
akohut@simmonsfirm.com
**SIMMONS BROWDER GIANARIS**
**ANGELIDES & BARNERD LLC**
One Court Street
Alton, Illinois 62002
Tel: (618) 259-2222
Fax: (618) 259-2251

12

Bradford D. Barron **(\*)**
13  bbarron@gbbfirm.com
Zachary T. Barron **(\*)**
14  zbarron@gbbfirm.com
**GIBBON, BARRON & BARRON, P.L.L.C.**
15  20 East 5th Street, Suite 1000
16  Tulsa, Oklahoma 74103
Tel: (918) 745-0687
17  Fax: (918) 745-0821

James M. Terrell **(\*)**
jterrell@mmlaw.net
**MCCALLUM METHVIN & TERRELL,**
**P.C.**
The Highland Building
2201 Arlington Avenue South
Birmingham, Alabama 35205
Tel: (205) 939-0199
Fax: (205) 939-0399

18

19  **(\*) *Pro Hac Vice* Applications to be submitted**

20

21

22

23

24

25

26

27

28

-25-