**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VICKI AND RICHARD SUTCLIFFE,

                  Plaintiffs,

      v.

WELLS FARGO BANK, N.A., ET AL.,

                  Defendants.

_____/

Case No. C-11-06595 JCS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT WELLS FARGO BANK, N.A.'S MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT [Docket No. 30]**

## I.   INTRODUCTION

Plaintiffs bring a purported class action on behalf of themselves and others who are similarly situated alleging that Defendant Wells Fargo Bank, N.A. ("Wells Fargo") offers "illusory trial loan modification programs" to borrowers facing foreclosure without any intention of offering these individuals permanent loan modifications.   Presently before the Court is Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss Plaintiffs' Class Action Complaint ("the Motion"), in which Wells Fargo seeks dismissal of all of Plaintiffs' claims under Rule 12(b)(6), 12(b)(1) and 9(b) of the Federal Rules of Civil Procedure.   A hearing on the Motion was held on Friday, April 27, 2012 at 9:30 a.m.   For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.   BACKGROUND

### A.   The Complaint

Plaintiffs Vicki and Richard Sutcliffe are a married couple residing in Kansas City, Missouri. Complaint ¶ 9.   They are borrowers under a note evidencing a loan ("the Sutcliffe Loan") relating to a home in Kansas City.   *Id*.   Defendant Wells Fargo Bank, N.A., is a national banking association with its principal place of business in San Francisco, California.   *Id*. ¶ 10.

---

[1]The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The Sutcliffe Loan was taken out in July 2006. *Id.* ¶ 25. The amount financed to purchase the property was $140,000.00. *Id.* ¶ 25. The Sutcliffe's monthly payment was approximately $1,180.00 per month. *Id.*

In 2009, Richard Sutcliffe's pay and hours were reduced, while Vicki Sutcliffe's medical expenses increased because her employer no longer paid all of her health insurance coverage. *Id.* ¶ 26. As a result, the Sutcliffes could not afford the monthly payments on their loan and requested a loan modification from Wells Fargo. *Id.* In December 2009, Wells Fargo sent the Sutcliffes a document entitled "Home Affordable Modification Program Trial Period" (the "TPP"). *Id.* ¶ 27.

The TPP set forth the terms pursuant to which the Sutcliffes would qualify for a Loan Modification Agreement that would permanently modify the terms of their loan. *Id.* The first two paragraphs of the TPP state as follows:

If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. . . .

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income . . . to determine whether I qualify for the offer described in this Plan. I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

Defendant Wells Fargo Bank, N.A.'s Request for Judicial Notice ("RJN"), Ex. 1.[2]

Section 1 of the TPP, entitled "My Representations," required the Sutcliffes to certify the following representations:

A.    I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

B.    I live in the Property as my principal residence, and the Property has not been condemned;

─────────────────────

[2]Plaintiffs do not object to Wells Fargo's request for judicial notice, which is GRANTED.

2

C.    There has be no change in the ownership of the Property since I signed the Loan Documents;

D.    I am providing or already have provided documentation for all income that I receive (except that I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

E.    Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

F.    If Lender requires me to obtain credit counseling, I will do so.

G.    If I have been discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents.  Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Plan. I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as necessary, to ensure that the modified mortgage Loan retains its first lien position and is fully enforceable.

RJN, Ex. 1, Section 1; Complaint ¶ 30.

Section 2 of the TPP set forth the trial payment schedule and amounts, requiring the Sutcliffes to make three payments, on January 1, 2010, February 1, 2010 and March 1, 2010, of $787.71 each.  RJN, Ex. 1, Section 2.; Complaint ¶ 28.  It also contained the following provision:

If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.  In this event, the Lender will have all the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me.

RJN, Ex. 1, Section 2F.  The TPP states in the next section:

I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan. . . .

RJN, Ex. 1, Section 2G.

On December 12, 2009, the Sutcliffes signed the Trial Pan and returned it to Wells Fargo. Complaint ¶ 31.  They also submitted the required Hardship Affidavit.  *Id.*

3

The Sutcliffes made all three payments under the Trial Pan but did not receive paperwork for a loan modification at the end of that period. *Id*. ¶ 33.  The Sutcliffes continued to make payments at the trial period rate through July 2010.  *Id*.

On May 16, 2010, Wells Fargo sent the Sutcliffes a letter stating that their loan was in default for failure to make payments due. *Id*. ¶ 34.  This letter bore a return address for Wells Fargo in Temecula, California.  *Id*.

On June 2, 2010, Wells Fargo sent the Sutcliffes a letter stating that it was "unable to adjust the terms of [their] mortgage under the Home Affordable Modification Program," but that it would review their loan "for alternative loss mitigation solutions and notify [them] separately of the results of that review."  *Id*. ¶ 35; *see also* RJN, Ex. 2.

On June 13, 2010, Wells Fargo sent the Sutcliffes another letter stating that their loan was in default.  *Id* ¶ 37.  The return address on this letter, like the May 16 letter, was in Temecula, California.  *Id*.

On July 19, 2010, Wells Fargo sent the Sutcliffes a letter notifying them that their request for "Repayment Agreement" had been denied but that there might be other alternatives to assist them, including loan modification.  *Id*. ¶  38.

On July 28, 2010, the Sutcliffes received another letter from Wells Fargo ("the Initial Forbearance Offer"), offering them a "Special Forbearance Plan" under which they would make three payments of $1,179.31 from August to October 2010.  *Id*. ¶ 39; *see also* RJN, Ex. 3.  The Sutcliffes executed and returned the Initial Forbearance Offer and made the three required payments, which were essentially full mortgage payments and substantially more than the payments under the TPP.  *Id*. ¶ 43.

After making the three required payments under the Initial Forbearance Plan, the Sutcliffes received letters dated October 31, 2010 and November 28, 2010 stating that their loan was in default.  *Id*. ¶ 44.  These letters bore a return address in Temecula, California.  *Id*.

The Sutcliffes made additional payments of $693.14 on November 24, 2010 and $880.00 on December 28, 2010, which were the amounts the Sutcliffes could afford to pay at the time.  *Id*. ¶ 45.  The payment for $800.00 was returned and Vicki Sutcliffe was told not to make any additional

1  payments because they would not be returned.  *Id.*  The Sutcliffes did not make any payments from

2  January 2011 to March 2011.  *Id.*

3         On January 4, 2011, the Sutcliffes received a letter from a law firm informing them that it

4  had been retained by Wells Fargo to initiate foreclosure proceedings.  *Id.* ¶ 46.  A letter from Wells

5  Fargo dated January 3, 2011 confirmed that the loan file had been sent by Wells Fargo to a law firm

6  to initiate foreclosure proceedings.  *Id.*  The Sutcliffes also received a Notice of Trustee's Sale

7  stating that the property would be sold at auction on March 24, 2011.  *Id.*

8         On January 31, 2011, Vicki Sutcliffe sent a letter to Wells Fargo asking it to reconsider the

9  loan modification.  *Id.* ¶ 47.  The Sutcliffes received a response from Wells Fargo's law firm dated

10  March 8, 2011 stating that in order to reinstate the loan they would need to make payments in the

11  amount of $9,930.93 for payments due starting in September 2010.  *Id.* ¶ 48.

12         On March 31, 2011, the Sutcliffes received a letter from Wells Fargo again offering them a

13  "Special Forbearance Agreement" and informing them that their loan was due for 7 installments

14  from September 1, 2010 through March 1, 2011.  *Id.* ¶ 49.  The March 31 letter did not set forth the

15  time frame or amounts that were to be paid under the offer.  *Id.*  Wells Fargo sent the Sutcliffes

16  another latter, dated April 15, 2011, which contained substantially the same offer ("the Second

17  Forbearance Offer") but included the dates and amounts of the payments.  *Id.* ¶ 50.  In particular,

18  under the Second Forbearance Offer, the Sutcliffes were instructed to pay $867.23 each month from

19  April 2011 through July 2011.  *Id.*  The Sutcliffes signed the Second Forbearance Offer on May 3,

20  2011 but had begun making payments on April 22, 2011.  *Id.*

21         On April 7, 2011, the Sutcliffes received a second "Notice of Trustee's Sale," stating that the

22  property would be sold at auction on May 2, 2011.  *Id.* ¶ 51.  The Sutcliffes continued to make

23  monthly payments of $867.23 from April 2011 through July 2011.  *Id.*

24         On July 19, 2011, Vicki Sutcliffe sent another letter to Wells Fargo again informing Wells

25  Fargo of their financial hardship and stating that it was now their "fourth time to finish out the same

26  process with 'no changes in their circumstances sending in paperwork and payments on time and as

27  instructed.'" *Id.*  ¶ 52.  The Sutcliffes had sent the same paperwork in December 2009, November

28  2010 and February 2011.  *Id.*

United States District Court

For the Northern District of California

In July 2011, the Sutcliffes were informed that their file had been assigned to Wells Fargo case manager Sheryl Oliver, who told Vicki Sutcliffe to continue making the $867.23 payment each month, and the Sutcliffes have made those payments from April 2011 to the present. *Id*. ¶ 53.

As recently as December 13, 2011, Ms. Oliver "continued to request that Vicki Sutcliffe send additional updated and current documentation, even though the Sutcliffes [had] complied with all terms of the [TPP] and the Forbearance Plans and [had] submitted complete and accurate supporting documentation, and even though Wells Fargo [had] repeatedly notified the Sutcliffes that their loan [was] in default and that a Trustee's Sale [was] imminent." *Id* ¶ 54.

Plaintiffs also include class allegations in their complaint. *Id*. ¶¶ 57-63.   In the class allegations, Plaintiffs allege that they are bringing this action on behalf of "all homeowners nationwide who received a trial loan modification proposal substantially similar to the TPP from any of the Defendants; made the payments set forth in the proposal; provided true information with respect to all representations required by the proposal; and were either (a) denied a permanent loan modification; (b) offered an illusory 'modification' on terms substantially similar to their unmodified loan; and/or (c) who received, entered into, and complied with the above described Forbearance Plans from Wells Fargo, consisting of the Offer Letter and Agreement, in substantially the same form(s) presented to Plaintiffs." *Id*. ¶ 57.

On the basis of the factual allegations summarized above, Plaintiffs asserted the following claims:

> 1) **Claim One**:  Violation of Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq., based on allegations that Defendants' conduct is (i) "unlawful" because it violates 15 U.S.C. §§ 1692 e & f [the Fair Debt Collection Practices Act ("FDCPA")]; (ii) "fraudulent" because "Defendants falsely represented that their trial modification plans and modification proposals could prevent foreclosure and falsely represented that borrowers would qualify for loan modification solely through the submission of true representations and the requested trial plan payments; additionally fraudulent because the Forbearance Plans intended to and likely did mislead the public into believing that they could obtain an opportunity to retain their homes;" and (iii) "unfair" because it "offends legislative policy with regard to the use of fraudulent, deceptive, misleading, unfair and unconscionable means in the collection of debts and further offends California's legislative policy set forth in Cal. Civ. Code § 2923.5, which requires that the mortgagee contact the borrower prior to filing a notice of default in order to "explore options for the borrower to avoid foreclosure." *Id*. ¶ 66. According to Plaintiffs, they have suffered "injury in fact and have lost money or property as a result of the conduct described herein [because they were] induced by Defendants' unlawful, fraudulent, and unfair conduct to make payments to Defendants totaling thousands

of dollars which they would not have made, and which could not lawfully have been collected from them after foreclosure." *Id.* ¶ 72.

2) **Claim Two**: Breach of Contract/Implied Covenant of Good Faith and Fair Dealing based on allegation that the TPP was a contract between Wells Fargo and the homeowners setting forth the terms on which the homeowners would qualify for a Loan Modification Agreement, that the Sutcliffes fully performed under that contract and that Wells Fargo breached the agreement by failing to provide a loan modification, *id.*, ¶¶ 75-78, and based on further allegations that the Sutcliffes fully performed under the subsequent Special Forbearance Agreements and that Wells Fargo breached these agreements by failing to provide a loan modification "or any opportunity for same." *Id.* ¶¶ 79-81. Plaintiffs further allege that to the extent Wells Fargo claims that it reserved for itself the ultimate discretion as to whether or not a modification would be offered, Wells Fargo has breached the covenant of good faith and fair dealing implied in its agreements with Plaintiffs. *Id.* ¶ 82.

**Claim Three**: Rescission and Restitution under Cal. Civ. Code §§ 1688-1689 stating that the TPPs and Forbearance Plans are rescinded and seeking to recover the payments made by Plaintiffs under those agreements. *Id.* ¶¶ 87-92.

## B.    The Permanent Modification Agreement

In its Reply brief, Wells Fargo informs the Court that the Sutcliffes recently were offered and accepted a permanent loan modification.   Reply at 1 & Ex. A (Loan Modification Agreement signed by the Sutcliffes on March 14, 2012).[3]

## C.    The Motion

In the Motion, Wells Fargo contends that Plaintiffs' claims fail as a matter of law for the following reasons:

First, according to Wells Fargo, Plaintiffs' claims are not ripe for decision because when the action was filed Wells Fargo had not yet decided whether it would offer Plaintiffs a permanent modification.  Motion at 8-9 (citing *Alexander-Jones v. Walmart Stores, Inc.*, 2012 WL 215171, at *2 (N.D. Cal. Jan. 24, 2012)).

Second, Wells Fargo contends that because Plaintiffs are not California residents, the property at issue is not in California and no conduct is alleged to have occurred in California, Plaintiffs are barred from asserting California statutory claims. *Id.* at 10-12 (citing *Norwest Mortgage v. Superior Court*, 72 Cal. App. 4th 214 (1990); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (2012)).

---

[3]Plaintiffs stipulated at oral argument that the Court may take judicial notice of the loan modification agreement.

**United States District Court**
For the Northern District of California

1    Third, Wells Fargo argues that even if California law applies, Plaintiffs fail to state a claim

2   under the UCL.  *Id*. at 12.  According to Wells Fargo, this claim is predicated on allegations that

3   Wells Fargo: 1) violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e,

4   1692f (citing Complaint ¶ 66(a)); 2) fraudulently represented that Plaintiffs would be provided a

5   permanent loan modification (citing Complaint, ¶ 66(b); and 3) unfairly collected reduced monthly

6   payments from plaintiffs in violation of Cal. Civ. Code Section 2923.5 (citing Complaint ¶ 66(c)).

7   *Id*. at 13.  Wells Fargo asserts that Plaintiffs fail to state a UCL claim on any of these grounds.  As to

8   UCL claim based on the alleged violation of the FDCPA, Wells Fargo contends that this statute does

9   not apply because it is the original creditor on Plaintiffs' loan and therefore is not a debt collector.

10   *Id.* (citing 15 U.S.C. § 1692A(6)).  With respect to the claim based on Wells Fargo's alleged

11   fraudulent representation that it would offer Plaintiffs a permanent modification, Wells Fargo argues

12   that this claim is not ripe, is contradicted by the language of the TPP and the Special Forbearance

13   Agreements (which do not promise a permanent modification, according to Wells Fargo) and does

14   not satisfy the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure

15   that applies to this claim.  *Id*.  In particular, Wells Fargo argues that Plaintiffs have failed to identify

16   specific deceptive statements or omissions and also have not alleged facts showing why those

17   statements or omissions would mislead the public.  *Id*.  As to the UCL claim based on the collection

18   of reduced monthly payments, Wells Fargo argues, this claim fails because there is no authority that

19   California's prohibition on the collection of a deficiency judgment *after* foreclosure, Cal. Civ. Code

20   Section 580d, renders collection of reduced mortgage payments *before* foreclosure unfair.  *Id*. at 15-

21   16 (citing *Reyes v. Wells Fargo Bank, N.A.*, 2011 WL 30759, at * 16 (N.D. Cal. Jan. 3, 2011)).

22    Fourth, Wells Fargo argues that Plaintiffs' breach of contract/breach of implied covenant of

23   good faith and fair dealing claim fails to state a claim because Plaintiffs have not alleged sufficient

24   facts to show the elements of a breach of contract claim, namely, the existence of a contract for a

25   permanent loan modification, consideration to support such a contract, and cognizable damages.  *Id*.

26   at 15.  With respect to the existence of a contract for a permanent modification, Wells Fargo argues

27   that no facts in the complaint suggest that there was mutual assent to a permanent modification

28   because the TPP and Special Forbearance Agreements were expressly conditional.  *Id*. at 16.  Wells

**United States District Court**
For the Northern District of California

1  Fargo points to a case in which a California appellate court held that a trial plan with the same

2  language contained in the TPP did not give rise to a contract for permanent modification.  *Id.* at 14

3  (citing *Nungaray v. Litton Loan Services*, 200 Cal. App. 4th 1499 (2011)).  It also notes that this

4  Court, in *Reyes v. Wells Fargo Bank, N.A.*, recognized that a "breach of contract claim premised on

5  the theory that a special forbeance plan 'promise[d] [borrowers] a meaningful opportunity to retain

6  their home' cannot withstand a motion to dismiss because the language of the plan unambiguously

7  states that it is not a promise for a permanent modification."  *Id.* at 15 (citing 2011 WL 30759, at *

8  15 (N.D. Cal. Jan. 3, 2011)).

9        With respect to consideration, Wells Fargo contends that Plaintiffs are required to allege

10  either a benefit conferred or prejudice suffered, which are not satisfied by Plaintiffs' allegations that

11  they submitted financial documents and made reduced payments.  *Id.* at 18 (citing *Mehta v. Wells*

12  *Fargo Bank, N.A.*, 737 F. Supp. 2d 1185, 1197 (S.D. Cal. 2010)).  Wells Fargo argues that any

13  documentation that was submitted in connection with the TPP to satisfy the Home Affordable

14  Modification Program ("HAMP"), a federal program launched in early 2009 by the U.S. Treasury,

15  does not constitute consideration because it was merely undertaken to obtain the benefits of a public

16  program.  *Id.*  Similarly, reduced mortgage payments on a pre-existing loan contract does not

17  constitute consideration, Wells Fargo asserts.  *Id.* at 19 (citing *Henry H. Cross Co. of Cal. v.*

18  *Prentice*, 137 Cal. App. 497, 500 (1934); *Salgado v. America's Servicing Co.*, 2011 WL 3903072, at

19  *2 (D. Ariz. Sept. 6, 2011)).

20        Even if a contract to modify the loan exists and is supported by consideration, Wells Fargo

21  argues, Plaintiffs' breach of contract claim fails because they have not alleged any cognizable

22  damages.  *Id.* at 19 (citing *Wall Street Network, Ltd., v. NY Times Co.*, 164 Cal. App. 4th 1171, 1178

23  (2008)). According to Wells Fargo, Plaintiff's damages theory is that because California is a non-

24  recourse state, that is, a deficiency judgment is not available after foreclosure, Plaintiffs' reduced

25  mortgage payments constitute damages.  *Id.* (citing Complaint ¶ 55, Cal. Civ. Code Section 580d).

26  Wells Fargo contends that this theory fails because Plaintiffs reside in Missouri, which *does* permit

27  deficiency judgments, and California law should not apply.  *Id.*  Even under California law,

28

1    Defendant asserts, Plaintiffs' theory fails because California's anti-deficiency statute does not offer

2    relief *before* foreclosure, as this Court held in *Reyes*. *Id*.

3        Fifth, Wells Fargo asserts that Plaintiffs fail to state a claim for rescission and restitution. *Id*.

4    at 20-21. As to rescission, Wells Fargo argues that this is not a stand-alone claim, that it is not pled

5    with sufficient specificity to the extent it is based on alleged fraud, and that to the extent it is based

6    on failure of consideration under Cal. Civ. Code Sections 1689(b)(2) and (4), Plaintiffs have not

7    alleged what consideration was promised by Wells Fargo and how it fell short. *Id*. Similarly, as to

8    Plaintiffs' restitution claim, that claim fails, according to Wells Fargo, because Plaintiffs have not

9    alleged any facts showing that Wells Fargo was unjustly enriched, given that Wells Fargo was

10   entitled to mortgage payments under the original deed of trust. *Id*. at 21 (citing *Reyes*, 2011 WL

11   30759, at * 18 (N.D. Cal. Jan. 3, 2011)).

12       Wells Fargo further contends that to the extent Plaintiffs' claims are based on Wells Fargo's

13   failure to offer Plaintiffs a loan modification under HAMP, the claims are an impermissible attempt

14   to use state law to obtain remedies that are not available under HAMP. *Id*. at 22-23.

15       Finally, Wells Fargo argues that Plaintiffs' claims are preempted by the National Bank Act to

16   the extent that Act prohibits state law actions that interfere with a national bank's ability to fully

17   exercise its real estate lending powers, including its right to service mortgage loans without state law

18   interference. *Id*. at 24 (citing 12 C.F.R. § 34.4(a); *Barnett Bank of Marion County, N.A. v. Nelson*,

19   517 U.S. 25, 31 (1996); *Vinal v. Wells Fargo Bank, NA.*, 2011 WL 4344169, at *4 (N.D. Cal. Sept.

20   15, 2011)). According to Wells Fargo, the preemption regulations under the National Bank Act are

21   substantially the same as those that have been adopted under the Home Owner's Loan Act

22   (""HOLA") and therefore, the preemption analysis under both statutes is essentially the same. *Id*. at

23   24 n. 25 (citing *Copeland-Turner  v. Wells Fargo Bank, N.A.*, 800 F. Supp. 2d 1132, 1143 n. 6

24   (D.Or. 2011)).

25       **D.     The Opposition**

26       In their Opposition, Plaintiffs challenge Wells Fargo's assertion that the action is not ripe

27   because it has not denied the Sutcliffes a permanent loan modification, pointing to the allegations in

28   the complaint that Wells Fargo notified Plaintiffs in June 2010 that it would not provide them with a

1    loan modification, even though Plaintiffs had complied with all of the requirements for obtaining a

2    modification set forth in the TPP.  Opposition at 3-5 (citing Complaint, ¶¶ 33-34).  Because Wells

3    Fargo promised it would modify Plaintiffs' loan if they made the three trial payments, Plaintiffs

4    contend, Plaintiffs' breach of contract claim became ripe when Wells Fargo failed to honor that

5    promise and instead sent them notices indicating it was commencing foreclosure proceedings.  *Id*. at

6    5.  In particular, Plaintiffs faced the "imminent loss" of their home, rendering the dispute anything

7    but remote and hypothetical.  *Id*.  In a footnote, Plaintiffs note that Wells Fargo "may still offer

8    Plaintiffs a permanent loan modification" but that this does not make this dispute unripe" because

9    "[a] defendant may always offer to rectify the harm done, once it has been sued . . .[but] that does

10   not mean that plaintiffs must wait until it would be impossible for defendant to offer relief of any

11   kind before they can sue."  *Id*. n. 1.  Plaintiffs contend that Wells Fargo's reliance on *Alexander-*

12   *Jones v. Walmart Stores, Inc*., 2012 WL 215171 (N.D. Cal. Jan. 24, 2012) is misplaced because it

13   involved a legal theory that was "entirely hypothetical."  *Id*. at 5.

14           Plaintiffs  also reject Wells Fargo's argument that their claims are preempted under the

15   National Bank Act.  *Id*. at 6-10.  Plaintiffs disagree that the relevant regulation under the National

16   Bak Act is similar to that under HOLA but argue that even if it is, Plaintiffs' claims are not

17   preempted under either one because they only incidentally affect lending operations, that is, they are

18   not specific to Wells Fargo's activities as a lender but instead are based on legal duties that are

19   applicable to all businesses.  *Id*.  *Id*. at 6-7.  According to Plaintiffs, Wells Fargo mischaracterizes

20   their claims when it contends that they are directed at requiring Wells Fargo to provide a loan

21   modification regardless of whether or not Plaintiffs' meet HAMP guidelines.  *Id*. at 9.  Plaintiffs

22   argue that they "do *not* allege that Wells Fargo was required to provide Plaintiffs with a loan

23   modification and do not purport to dictate Wells Fargo's criteria for doing so; rather, Plaintiffs allege

24   only that, if Wells Fargo required further analysis in order to determine whether Plaintiffs qualified

25   for a permanent modification, it was precluded from misrepresenting that, subject to the most minor

26   confirmation process, the borrower had in effect already qualified for a modification."  *Id*. at 9

27   (citing Complaint ¶ 69). On this basis Plaintiffs distinguish cases cited by Wells Fargo in support of

28   its position, including *Vinal v. Wachovia*, 2011 WL 1807218 (N.D. Cal. April 22, 2011).

1    Similarly, Plaintiffs reject Wells Fargo's contention that their claims are an attempt to obtain

2    under state law remedies that are not available under HAMP.  *Id*. at 10-12.  Plaintiffs argue that

3    Wells Fargo is simply asserting "preemption in disguise," and that this argument was rejected in the

4    Seventh Circuit's recent decision in *Wigod v. Wells Fargo Bank, N.A.,*  – F.3d – , 2012 WL 727646

5    (7th Cir. Mar. 7, 2012).

6        Turning to the choice of law question, Plaintiffs contend that under *Norwest*, Plaintiffs have

7    adequately alleged that the relevant conduct occurred in California and therefore, that Plaintiffs may

8    assert California state law claims.  *Id*. at 12-16.  Plaintiffs point to their allegations that Wells

9    Fargo's principal place of business is in California, that the TPP directed them to make their

10   payments to an address in California and that Wells Fargo sent Plaintiffs default notices carrying a

11   California return address.  *Id*. at 13 (citing Complaint, ¶¶ 27-29, 34, 37, 44).

12       Plaintiffs further contend that they state claims for violation of the UCL, breach of contract

13   and restitution/rescission.  *Id*. at 16-25.  As to the UCL claim, Plaintiffs contend that they have

14   sufficiently alleged violations of the UCL on the basis of conduct that is both fraudulent and unfair,

15   namely, falsely representing in the TPP that it would modify Plaintiffs' loan so long as Plaintiffs

16   made the required payments and representations and then failing to offer the modification.  *Id*. at 16-

17   17 (citing *Reyes*, 2011 WL 30759, *22 (N.D. Cal. Jan. 3, 2011)).  Plaintiffs reject Wells Fargo's

18   argument that their pleadings are not sufficient under Rule 9(b), arguing that the documents that are

19   alleged to be deceptive are adequately identified.  *Id*. at 17-18 (citing *Reyes*, 2011 WL 30759, *21

20   (N.D. Cal. Jan. 3, 2011)).  Plaintiffs do not challenge Wells Fargo's assertion that their UCL claim

21   fails to the extent it is based on the FDCPA, stating that they are not seeking to assert a UCL claim

22   based on "unlawful" conduct.  *Id*. at 18 n.6.  They note, however, that if the Court finds that their

23   UCL claim is insufficient, they will seek leave to amend to assert a UCL claim based on unlawful

24   conduct under California's Rosenthal Act, Cal. Civ. Code § 1788.17.

25       With respect to their breach of contract claim, Plaintiffs reject Wells Fargo's contention that

26   the TPP was not a contract for a permanent modification, citing the Seventh Circuit's decision in

27   *Wigod*, where the same language was found to give rise to a contract for a permanent modification.

28   *Id*. at 19-22.  In particular, Plaintiffs contend that: 1) there was mutual assent to the TPP; 2) the TPP

United States District Court

For the Northern District of California

1    was sufficiently definite; and 3) the TPP was supported by consideration. *Id.* Plaintiffs assert that to

2    the extent a California court reached a contrary conclusion in *Nungaray v. Litton Loan Servicing,*

3    *LP*, 200 Cal. App. 4th 1499, 1504 (2011), that decision was poorly reasoned and, in any event,

4    distinguishable because the plaintiff did not provide the lender the required information. *Id.* at 21-

5    22. On the question of consideration, Plaintiffs again pointed to *Wigod*, noting that in that case the

6    Seventh Circuit found that Wells Fargo's promises in the TPP were supported by consideration

7    because the plaintiff "agreed to open new escrow accounts, to undergo credit counseling (if asked),

8    and to provide and vouch for the truth of her financial information." *Id.* at 23. Regarding damages,

9    Plaintiffs reject Wells Fargo's argument that Plaintiffs suffered no cognizable damages, citing to

10   Plaintiffs' allegation that "[a]s a result of the prolonged 'trial period,' the Sutcliffes paid many

11   thousands of dollars while waiting to hear from Defendants about their modification." *Id.* at 24

12   (citing Complaint ¶ 33).[4] Plaintiffs also point out that in *Wigod*, the Seventh Circuit found that the

13   plaintiffs had alleged sufficient damages on their breach of contract claim where the plaintiff alleged

14   that she "'incurred costs and fees, lost other opportunities to save her home, suffered a negative

15   impact to her credit, never received a Modification Agreement, and lost her ability to receive

16   incentive payments during the first five years of modification.'" *Id.* at 24 (quoting 2012 WL

17   727646, at * 8).

18          Finally, as to the Rescission/Restitution claim, Plaintiffs contend that Wells Fargo

19   "misapprehends" their claim. *Id.* at 24. According to Plaintiffs, Cal. Civ. Code Section 1691 allows

20   a party to unilaterally rescind a contract by giving notice of the rescission and offering to restore

21   everything of value which had been received and that is what Plaintiffs seek to do. *Id.* at 25. In the

22   alternative, Plaintiff argue the claim seeks rescission as a remedy for fraud and states a claim for the

23

24

25

26

27          [4]At oral argument, Plaintiffs' counsel represented that Plaintiffs also incurred damages as a result
       of Wells Fargo's delay because their credit rating suffered and because approximately $15,000 was
28     added to the principal amount of their loan.

1  same reasons its UCL claim is sufficiently alleged.  *Id*. Plaintiffs clarify, however, that they are not

2  asserting a separate claim for restitution.[5]

3       **E.     The Reply**

4       Wells Fargo points out at the outset of its Reply brief that Plaintiffs' Opposition addresses on

5  the TPP, apparently abandoning any claims based on the two Special Forbearance Agreements.

6  Reply at 2-3.  Therefore, Wells Fargo contends, Plaintiffs' claims should be dismissed to the extent

7  they are based on the Special Forbearance Agreements.

8       As to Plaintiffs' claims based on the TPP, Wells Fargo asserts, those claims were previously

9  unripe and now are moot because Wells Fargo has provided Plaintiffs with a permanent

10 modification.  Wells Fargo further contends that Plaintiffs can allege no damages on their breach of

11 contract claim and that as to their rescission claim, any damages in the form of the reduced payments

12 made under the TPP are offset by the amounts owed to Wells Fargo for the value of remaining in the

13 house free of charge.  *Id.*  at 5-7.

14       On the question of whether Plaintiffs may proceed under California law, Wells Fargo argues

15 that Plaintiffs' allegations are too conclusory to establish that Plaintiffs are entitled to the protection

16 of California law, particularly in light of the fact that Plaintiffs reside in Missouri.  *Id*. at 7-8.

17       Addressing the UCL claim, Defendant rejects Plaintiffs' assertion that they have met rule

18 9(b)'s specificity requirements as to the alleged fraudulent conduct, again arguing that Plaintiffs

19 have not identified specific misrepresentations.  *Id*. at 8-9.  Wells Fargo also rejects Plaintiffs'

20 argument that it unfairly collected payments that it could not have obtained after foreclosure, citing

21 this Court's decision in *Reyes* rejecting a similar argument.  *Id*. at 9.

22       With respect to the existence of a contract, Wells Fargo contends that this Court is bound to

23 follow *Nungaray* on this question and not *Wigod*.  *Id*. at 9-10.  As the court in *Nungaray* found that

24 the identical language did not create a contract, this Court should reach the same result.  *Id*.  In any

25 event, Wells Fargo asserts, *Wigod* is distinguishable because in that case, Wells Fargo executed the

26 TPP and returned it to the plaintiff whereas here, there is no signed TPP in the record.  *Id*.

27 ─────────────

28      [5]At oral argument, Plaintiffs further stipulated that the rescission claim is moot in light of the permanent modification of Plaintiffs' loan.  Accordingly, the Motion is GRANTED as to Claim Three.

1    As to the rescission claim, Wells Fargo argues that to the extent Plaintiffs have clarified that

2    the claim is for unilateral rescission, it is factually implausible because Wells Fargo has offered a

3    permanent modification and Plaintiffs have accepted that offer.  *Id*. at 12.  Furthermore, Wells Fargo

4    contends, to state a claim for rescission based on fraud, Plaintiffs must allege fraud with specificity.

5    *Id*.  Wells Fargo argues that Plaintiffs have not met that standard for the reasons discussed above.

6    *Id*.

7    Wells Fargo argues that on the question of whether state law claims can be used to enforce

8    HAMP, *Wigod* was incorrectly decided and that the Court should bar Plaintiffs' claims because they

9    amount to an end-run around HAMP.  *Id*. at 13.  Wells Fargo also rejects Plaintiffs' assertion that

10   their claims are not preempted under the National Bank Act because they are only incidental to

11   Wells Fargo's lending practices.  *Id*.  Rather, Wells Fargo asserts, Plaintiffs' claims go to the heart

12   of Wells Fargo's lending activities.  *Id*.

13   Finally, Wells Fargo contends that Plaintiffs should not be granted leave to amend until they

14   have filed a "proper motion" and Wells Fargo has been given an opportunity to respond.  *Id*. at 14.

15   **III.    ANALYSIS**

16       **A.    Legal Standard**

17           **1.    Rule 12(b)(1)**

18   Pursuant to Rule 12(b)(1), a party may seek dismissal of an action for lack of subject matter

19   jurisdiction.  Under Article III of the U.S. Constitution, the Court has subject matter jurisdiction only

20   if the party bringing the action has standing, an inquiry which addresses whether the plaintiff is the

21   proper party to bring the matter to the court for adjudication. *Chandler v. State Farm Mut. Auto. Ins.*

22   *Co.*, 598 F.3d 1115, 1122 (9th Cir.2010) (citing Erwin Chemerinsky, Federal Jurisdiction § 2.3.1, at

23   57 (5th ed.2007)).  The doctrine of ripeness is related to standing and "is a means by which federal

24   courts may dispose of matters that are premature for review because the plaintiff's purported injury

25   is too speculative and may never occur."  *Id*.  "Because standing and ripeness pertain to federal

26   courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss."

27   *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir.2010).  Further, the Ninth

28

1  Circuit held that mootness is properly raised under Rule 12(b)(1) because it goes to subject matter

2  jurisdiction.  *See Bland v. Fessler*, 88 F.3d 729, 732 n. 4 (9th Cir. 1996).

3         A motion to dismiss under Rule 12(b)(1) can be facial or factual.  *Safe Air For Everyone v.*

4  *Meyer*, 373 F.3d 1035, 1039 (9th Cir.2003).  A facial challenge asserts that the complaint, on its

5  face, fails to allege facts that would invoke federal jurisdiction.  *Id.*  Where a facial challenge is

6  asserted, the facts alleged are presumed true.  *Id*.  A factual challenges, on the other hand, disputes

7  the veracity of allegations in the complaint that would, if true, invoke federal jurisdiction.  *Id*.  In

8  addition, a mootness challenge based on events that occurred after the complaint was filed is treated

9  as a factual challenge.  *See, e.g., Mohammad v. Holder,* 2009 WL 3674177, at * 2-3 (D.Or., Nov.

10  03, 2009) (argument that court lacked subject matter jurisdiction under Rule 12(b)(1) because

11  plaintiff was granted requested relief after complaint was filed treated as a factual challenge).

12  Where the challenge is factual, the court may consider evidence outside the pleadings to determine

13  whether it has subject-matter jurisdiction. *McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988).

14              **2.       Rule 12(b)(6)**

15         A complaint may be dismissed for failure to state a claim for which relief can be granted

16  under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6).  "The purpose

17  of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star*

18  *Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the

19  pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a]

20  pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the

21  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

22          In ruling on a motion to dismiss under Rule 12, the court analyzes the complaint and takes

23  "all allegations of material fact as true and construe(s) them in the lights most favorable to the non-

24  moving party." *Parks Sch. of Bus. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may

25  be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid

26  theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint  must

27  "contain either direct or inferential allegations respecting all the material elements necessary to

28  sustain recovery under some viable legal theory."  *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 562

**United States District Court**
For the Northern District of California

(2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  The factual allegations must be definite enough to "raise a right to relief above the speculative level."  *Id.* at 1965.  However, a complaint does not need detailed factual allegations to survive dismissal.  *Id.* at 1964.  Rather, a complaint need only include enough facts to state a claim that is "plausible on its face."  *Id.* at 1974.  That is, the pleadings must contain factual allegations "plausibly suggesting (not merely consistent with)" a right to relief.  *Id.* at 1965 (noting that this requirement is consistent with Fed. R. Civ. P. 8(a)(2), which requires that the pleadings demonstrate that "the pleader is entitled to relief").

### 3.   Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  A court may dismiss a claim grounded in fraud when its allegations fail to satisfy Rule 9(b)'s heightened pleading requirements.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).  The plaintiff must include "the who, what, when, where, and how" of the fraud.  *Id.* at 1106 (citations omitted).  "The plaintiff must set forth what is false or misleading about a statement, and why it is false."  *Decker v. Glenfed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994).  A claim for fraud must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

### B.   Whether the Court has Subject Matter Jurisdiction under Rule 12(b)(1)

Wells Fargo contends that the Court should dismiss Plaintiffs' claims for lack of subject matter jurisdiction on the grounds that they were not ripe when the action was initiated and are now moot because it has offered Plaintiffs a permanent modification and Plaintiffs have accepted.  The Court rejects Wells Fargo's contention that the action was unripe at the time it was initiated.  The Court also concludes that with the exception of Plaintiffs' rescission claim (Claim Three), which Plaintiffs concede is moot, Plaintiffs claims are not moot.

United States District Court

For the Northern District of California

1    "Ripeness is intended to 'prevent the courts, through avoidance of premature adjudication,

2    from entangling themselves in abstract disagreements.'" *Maldonado v. Morales*, 556 F.3d 1037,

3    1044 (9th Cir. 2009) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, (1967), overruled on other

4    grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)).   Courts consider two factors in determining

5    whether a case is ripe for adjudication: 1) "the fitness of the issues for judicial decision;" and 2) "the

6    hardship to the parties of withholding court consideration." *Addington v. U.S. Airline Pilots Ass'n*,

7    606 F.3d 1174, 1179 (9th Cir.  2010) (citations omitted).  Wells Fargo's ripeness argument is a facial

8    challenge and therefore, the Court assumes the allegations in the complaint to be true to determine

9    whether Plaintiffs' claims were ripe when they were asserted.  The Court finds that they were.  First,

10   Plaintiffs' claims turn on conduct that had already occurred at the time the action was filed, namely,

11   Wells Fargo's failure to offer them a permanent modification after Plaintiffs allegedly complied with

12   all of the requirements of the TPP.  Thus, their claims were suitable for judicial decision.  Second,

13   the allegations were sufficient to show that denying judicial consideration would have imposed

14   significant hardship on Plaintiffs because they had received notices that they were in default on their

15   loan and that their file had been passed on to Wells Fargo's counsel to initiate foreclosure

16   proceedings.

17        The Court rejects Wells Fargo's reliance upon *Alexander-Jones v. Wal-Mart Stores*, 2012

18   WL 215171 (N.D. Cal. Jan. 24, 2012), which is distinguishable.  In that case, the plaintiffs asserted

19   that their employer, Wal-Mart, had underpaid contributions to profit-sharing and 401(k) plans to the

20   extent that the wages upon which those contributions were based were themselves the result of

21   gender discrimination and therefore lower than they should have been.  *Id.* at *2-3.  The court found

22   that these claims were unripe on the basis that they were not suitable for judicial consideration, no

23   court having yet found that the employer had engaged in gender discrimination.  *Id.*  The court

24   acknowledged that although Plaintiffs had not yet filed an action to pursue claims of gender

25   discrimination against Wal-Mart, they intended to do so.  *Id.*  Nonetheless, it found that the claims

26   were unripe because they could not be decided until a court resolved the underlying question of

27   whether the employer had engaged in gender discrimination.  *Id.*  Here, Plaintiffs' claims do not

28   turn on any underlying legal theories that requires a judicial determination before the Court can

1    resolve them.  Nor does the Court agree with Wells Fargo that Plaintiffs' claims are analogous to the

2    ones in *Alexander-Jones* because they are "conjectural."  *See* Reply at 5 n.7.  As discussed above,

3    Plaintiffs' allegations that they received notices of default and that their file had been passed on to

4    counsel to initiate foreclosure proceedings demonstrate a real and actual threat of foreclosure.

5           The Court also rejects Wells Fargo's contention that Plaintiffs' claims are moot because

6    Wells Fargo has offered Plaintiffs a permanent modification and Plaintiffs have accepted that offer.

7    A party asserting mootness has a heavy burden.  *Medici v. JPMorgan Chase Bank, N.A.* 2012 WL

8    929785, at * 3 (D.Or., Mar. 16, 2012) (citing *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008)).

9    "A claim is moot if it has lost its character as a present, live controversy."  *American Rivers v.

10   National Marine Fisheries Service*, 126 F.3d 1118, 1123 (9th Cir. 1997) (citations omitted).  Thus,

11   the Ninth Circuit has held that "[i]f an event occurs that prevents the court from granting effective

12   relief, the claim is moot and must be dismissed."  *Id.* (citation omitted).  In the context of

13   foreclosure, for example, claims for wrongful foreclosure are likely moot where the foreclosure is

14   cancelled and a loan modification is offered instead.  *See Wooten v. Countrywide Home Loans Inc.,*

15   2012 WL 346460, at *4 (E.D.Cal., Feb. 1, 2012).  On the other hand, claims that are related to a

16   foreclosure but which are based on alleged wrongful conduct that goes beyond the wrongful

17   foreclosure are not necessarily  rendered moot where the foreclosure is vacated.  *See, e.g., Medici v.

18   JPMorgan Chase Bank, N.A.*, 2012 WL 929785, at *3-4 (D.Or., Mar. 16, 2012) (holding that where

19   foreclosure was rescinded, claims challenging foreclosure were moot but negligence claims were not

20   because the plaintiff may still have suffered damages in the form of bank fees and attorneys' fees in

21   her efforts to retain her house).  The Court finds that that is the case here because Plaintiffs' claims

22   are based on Wells Fargo's alleged unfair and deceptive conduct in connection with the two

23   forbearance offers and the TPP and *not* on wrongful conduct committed in foreclosure proceedings.

24          **C.      Whether Plaintiffs Can Assert Claims Under California Statutory Law**

25          Wells Fargo contends Plaintiffs cannot assert claims under California law because they have

26   only included in their complaint conclusory allegations that the relevant conduct occurred in

27   California.  Wells Fargo is incorrect.

28

1     The parties agree that the applicable standard is set forth in *Norwest Mortgage, Inc. v.*

2   *Superior Court*, 72 Cal. App. 4th 214  (1999).  In that case, the court held that "state statutory

3   remedies may be invoked by out-of-state parties [only] when they are harmed by wrongful conduct

4   occurring in California."  72 Cal. App. 4th 214, 224-225 (1999) (citing *Diamond Multimedia*

5   *Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036 (1999)).  On that basis, the court of appeal reversed

6   a trial court decision certifying a nationwide class asserting claims under the UCL to the extent the

7   class included members who resided outside of the state and whose injuries resulted from conduct

8   which occurred outside of California.  *Id*. at 225.  In finding that these individuals could not assert

9   UCL claims, the court noted that the defendant's headquarters and principal places of operation were

10  outside of California; the fact that the defendant was incorporated in California and did business in

11  California, while sufficient for the purpose of finding personal jurisdiction, was *not* enough to

12  support the application of California law to this group of nonresidents.   *Id*. at 226.

13     Plaintiffs in this action have alleged that their injuries resulted from conduct that occurred in

14  California based not only on the fact that Wells Fargo is incorporated in California but also on

15  correspondence relating to Plaintiffs' loan that was sent from a Wells Fargo address in California,

16  and the fact that they were instructed to send their trial payments to an address in California.

17  Therefore, the allegations in this case are distinguishable from the facts of *Norwest* and are sufficient

18  to support the application of California law, at least at the pleading stage of the case.  *See Wang v.*

19  *OCZ Technology Group, Inc.,* 276 F.R.D. 618, 630 (N.D.Cal. 2011) (holding that the plaintiff's

20  allegations that the defendant's misleading marketing, advertising, and product information were

21  "conceived, reviewed, approved or otherwise controlled from [defendant's] headquarters in

22  California provided a sufficient basis at the pleading stage for the invocation of California law).

23  Wells Fargo's contention that the relevant conduct did not, in fact, occur in California, is a factual

24  question that may be suitable for resolution at summary judgment but does not support dismissal

25  under Rule 12(b)(6).

26

27

28

**D.     Whether Plaintiffs State Valid Claims**

**1.     UCL**

The UCL outlaws as unfair competition "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code, § 17200. Plaintiffs' UCL claim is based on conduct that is alleged to be "unfair" and "fraudulent."[6] According to Wells Fargo, Plaintiffs' UCL claim fails on both grounds because: 1) Plaintiffs have not alleged fraud with particularity; and 2) Plaintiffs have not alleged facts to show that Wells Fargo acted unfairly by collecting reduced mortgage payments prior to foreclosure when they had a preexisting obligation to make payments to Wells Fargo under the terms of their loan.  The Court rejects both arguments.

While Wells Fargo is correct that UCL claims premised on fraudulent conduct trigger the heightened pleading standard under Rule 9(b), *see Perez v. Wells Fargo Bank, N.A.,* 2011 WL 3809808, at *14 (N.D. Cal. Aug. 29, 2011), Plaintiffs have met that standard by identifying the specific representations that are alleged to be fraudulent, namely, the statements in the TPP and the forbearance offers purporting to offer a loan modification if the borrower complied with the terms of the offers.  As the Court explained in *Reyes*, "'[f]raudulent,' as used in the [UCL], does not refer to the common law tort of fraud but only requires a showing members of the public 'are likely to be deceived.'"*Reyes*, 2011 WL 30759, at *22 (citing *Olsen v. Breeze*, 48 Cal.App.4th 608, 618 (1996) (citation omitted)). Plaintiffs' allegations are sufficient, at this stage of the case, to state a UCL claim based on the theory that members of the public would likely be deceived by these communications from Wells Fargo.

Plaintiffs also state a claim under the unfair prong of the UCL.  In *Reyes*, this Court explained the requirements for establishing an unfair business practice under the UCL as follows:

> Under California law, "[t]he test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer."  *Smith v. State Farm Mutual*

---

[6]Plaintiffs also alleged unlawful conduct under the FDCPA as a basis for their UCL claim. However, they did not challenge Wells Fargo's assertion in the Motion that Wells Fargo is not a debt collector within the meaning of the FDCPA.   Therefore, the Motion is GRANTED to the extent the UCL claim is based on alleged violation of the FDCPA.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

> *Automobile Ins. Co.*, 93 Cal.App.4th 700, 718 (2001).  "An 'unfair' business practice occurs when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Id.* (citations omitted) (listing examples of unfair business practices, including "placing unlawful or unenforceable terms in a form contract").

4   *Id*.  In *Reyes*, the Court concluded that this standard was met, at least at the pleading stage, where

5   the agreement sent by Wells Fargo to the plaintiffs could have been understood as offering a trial

6   plan that complied with HAMP when in fact, it did not.  *Id*.  Similarly, in this case, Plaintiffs'

7   allegations are sufficient to state a claim as to Wells Fargo's alleged unfair conduct because

8   Plaintiffs could have believed they would be offered a loan modification if they complied with the

9   terms of the TPP and forbearance agreements.

10          Accordingly, the Court concludes that Plaintiffs state a claim under the UCL.

11                     **2.        Breach of Contract**

12           The elements of a cause of action for breach of contract are: 1)  the existence of the contract;

13   2) performance by the plaintiff or excuse for nonperformance; 3)  breach by the defendant; and 4)

14   damages.  *First Commercial Mortgage Co. v. Reece*, 89 Cal.App.4th 731, 745 (2001).  Wells Fargo

15   contends that Plaintiffs' breach of contract claim should be dismissed for failure to state a claim

16   because: 1) no contract for permanent modification existed under the TPP; and 2) no cognizable

17   damages have been alleged.

18

19                     **a.        Whether the TPP is an Enforceable Contract for a Permanent Loan Modification[7]**

20          The question of whether the TPP that was sent to Plaintiffs created an enforceable contract

21   for a permanent loan modification is the subject of extensive litigation in multiple jurisdictions.[8]

22   There is a split of authority on this question, including within this district.  Numerous courts have

23   held that the TPP is an enforceable agreement, at least for the purposes of surviving a motion to

24   dismiss under Rule 12(b)(6).  *See Wigod v. Wells Fargo Bank,* 637 F.3d 547 (7th Cir. 2012) (holding

25

26          [7]At oral argument, Plaintiffs stipulated that while their UCL claim is based on the forbearance agreements as well as the TPP, their breach of contract claim is based on the TPP only.

27          [8] According to one court, the TPP is "a Fannie Mae/Freddie Mac 'Uniform Instrument' that has

28   the appearances of a contract."  *Durmic v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 4825632, at * 1 (D. Mass. Nov. 24, 2010).

**United States District Court**
For the Northern District of California

1   that plaintiffs stated breach of contract claim based on TPP and that district court had erred in

2   dismissing claim on a Rule 12(b)(6) motion); *In re Ossman*, 2012 WL 315485, at * 3-4 (Bkrtcy.

3   C.D.Cal., Jan. 31, 2012) (denying motion to dismiss breach of contract claim based on TPP, finding

4   that at the pleading stage, allegations were sufficient to establish existence of enforceable contract);

5   *Gaudin v. Saxon Mortgage Services, Inc.*, 2011 WL 5825144, at *3-4 (N.D. Cal. Nov. 17, 2011)

6   (same); *Kennedy v. Wells Fargo Bank*, N.A., 2011 WL 4526085, at *2-3 (C.D. Cal. Sept. 28, 2011)

7   (same); *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805, at * 5-6 (W.D.Mich., Aug. 25, 2011)

8   (same); *Belyea v. Litton Loan Servicing, LLP, 2011 WL 2884964*, at *8 (D. Mass. July 15, 2011)

9   (same); *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, 2011

10  WL2637222, at * 3-4 (D. Mass. July 6, 2011) (same); *Turbeville v. JPMorgan Chase Bank*, 2011

11  WL 7163111, at * 4-5 (C.D.Cal., April 4, 2011) (same); *Durmic v. J.P. Morgan Chase Bank, N.A.*,

12  2010 WL 4825632, at * 1 (D. Mass. Nov. 24, 2010); *Bosque v. Wells Fargo Bank, N.A.*, 762 F.

13  Supp. 2d 342, 351-53 (D. Mass. 2011) (same); *Stagikas v. Saxon Mortg.*, *Servs., Inc.*, 795 F. Supp.

14  2d 129, 136 (D. Mass. 2011); *see also Ansanelli v. JP Morgan Chase Bank, N.A.*, 2011 WL

15  1134451, at *3-5 (N.D. Cal. March 28, 2011) (holding that plaintiffs stated breach of contract claim

16  under Rule 12(b)(6) based on oral offer to modify loan if plaintiffs successfully completed trial

17  payment plan).

18          On the other hand, some courts have dismissed breach of contract claims based on the TPP

19  under Rule 12(b)(6) on the basis that the TPP does not give rise to a contract, citing to the language

20  in the TPP stating that the loan will not be modified if the borrower does not receive a fully executed

21  copy of a modification agreement.  *See, e.g., Lucia v. Wells Fargo Bank, N.A.,* 798 F. Supp. 2d 1059,

22  1066 1068 (N.D. Cal. 2011) (dismissing breach of contract claim under Rule 12(b)(6) on the basis

23  that TPP did not give rise to enforceable contract because Plaintiffs had not alleged that they had

24  received a modification agreement, as required under Section 2 of the TPP); *Brill v. BAC Home*

25  *Loans Servicing*, 2011 WL 127891, at *3-4 (E.D. Cal. Jan. 14, 2011) (same); *Prasad v. BAC Home*

26  *Loans Servicing LP*, 2010 WL 5090331 (E.D.Cal., Dec. 7, 2010) (same);  *Stovall v. SunTrust*

27

28

1 *Mortg., Inc.*, 2011 WL 4402680, at * 11-12 (D.Md., Sept. 20, 2011) (same).[9]  In addition, in

2 *Nungaray v. Litton Loan Servicing*, 200 Cal. App. 4th 1499, at *2-3 (2011), a California appellate

3 court held, on summary judgment, that the plaintiff's breach of contract claim was subject to

4 dismissal, stating that "there was no contract here."  The Court finds more persuasive the reasoning

5 in the line of cases that has found, at least at the pleading stage, that the TPP offers a sufficient basis

6 to show the existence of an enforceable agreement.

7 **i.      Mutual Assent**

8      "Contract formation requires mutual consent, which cannot exist unless the parties 'agree

9 upon the same thing in the same sense.'" *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208

10 (2006)(quoting Cal. Civ.Code, §§ 1580, 1550, 1565).  Wells Fargo contends that because of the

11 contingent language in Section 2G, the TPP does not satisfy the mutual assent requirement.  Wells

12 Fargo cites Judge White's decision in *Lucia*, in which the court reasoned as follows:

13      Plaintiffs specifically allege that "[t]he TPP Contract promises a permanent HAMP
      modification for those homeowners who make the required payments under the plan and
14      fulfill the documentation requirements" and that "Wells Fargo breached the TPP Contract ...
      by failing to offer Plaintiffs and members of the Plaintiff Class permanent HAMP
15      modifications at the close of their Trial Periods." (Lucia Compl. at ¶¶ 41, 110; Corvello
      Compl. at ¶¶ 57, 94.) Plaintiffs fail to allege, however, that they have met all the conditions
16      set forth in the TPP Contract for loan modification, including receipt of a "fully executed
      copy of a Modification Agreement," and therefore fail to allege the existence of a binding
17      contract regarding a permanent loan modification.

18 798 F. Supp. 2d at 1068.

19      The reasoning in *Lucia*, however, was rejected in *Gaudin v. Saxon Mortg. Services, Inc*., 820

20 F.Supp.2d 1051 (N.D.Cal., 2011) ("*Gaudin I*").  In that case, Judge Seeborg concluded that  receipt

21 of a modification agreement was not a condition precedent to *any* obligation on the lender's part to

22 modify the loan under the TPP but rather was "best understood as explaining that the modification

23 will not take legal effect until such a document is signed, but [did] not serve as a condition precedent

24 to the lender's obligation to provide such an executed document."  820 F. Supp. 2d at 1054 n. 5.  In

25 ___

26      [9]In another case pending in this district in which the plaintiffs asserted a breach of contract claim
based on the TPP, Judge Breyer granted a preliminary injunction, finding that there were serious
27 questions going to the merits because of the language of the TPP stating that the loan "will be modified"
if the trial payments are made and the required information is provided. *Jackmon v. America's Servicing*
28 *Co.*, Case No. 11-03884 (N.D. Cal.), Docket No. 21.  That case has been stayed pending the Ninth
Circuit's decision of the appeal in *Lucia*.

a subsequent decision in the same case, the court denied a motion to dismiss the plaintiff's breach of

contract claim under the TPP and rejected the defendant's reliance on plaintiff's failure to allege

they had received a modification agreement, stating as follows:

> Saxon relies on paragraph 2F, which provides that the "Loan Documents will not be modified and the Plan will terminate" if, among other things, the lender does not provide a "fully executed copy of this Plan and the Modification Agreement." . . . Read literally, this language would suggest that even if all other conditions are satisfied, a lender has no obligation to provide a loan modification agreement unless it in fact provides a modification agreement. As noted in the prior order, this provision conflicts with the clear tenor of the remainder of the document and would render the other agreement promises illusory. At least at the pleading stage, a reasonable inference can be drawn that the language was merely intended to reemphasize to borrowers that their underlying loan agreements cannot and will not be deemed modified or no longer enforceable until and unless final modification agreements are fully executed. While the provision admittedly gives rise to an ambiguity, it does not permit a determination as a matter of law that the lender has unbridled discretion as to whether or not it will provide an executed copy of a modification agreement upon satisfaction of all other conditions of the TPP.

2011 WL 5825144, at *4 (N.D.Cal., Nov. 17, 2011) ("*Gaudin II*").

In *Wigod*, the Seventh Circuit reached a similar conclusion regarding the significance of the

qualifying language in Section 2 of the TPP.  The Seventh Circuit reasoned as follows:

> According to Wells Fargo, [Section 2G of the TPP] meant that all of its obligations to Wigod terminated if Wells Fargo itself chose not to deliver "a fully executed TPP *and* 'Modification Agreement' by November 1, 2009." In other words, Wells Fargo argues that its obligation to send Wigod a permanent Modification Agreement was triggered only if and when it actually sent Wigod a Modification Agreement.  Wells Fargo's proposed reading of section 2 would nullify other express provisions of the TPP Agreement. Specifically, it would nullify Wells Fargo's obligation to "send [Wigod] a Modification Agreement" if she "compl[ied] with the requirements" of the TPP and if her "representations . . . continue to be true in all material respects." TPP § 3. Under Wells Fargo's theory, it could simply refuse to send the Modification Agreement for any reason whatsoever—interest rates went up, the economy soured, it just didn't like Wigod—and there would still be no breach. Under this reading, a borrower who did all the TPP required of her would be entitled to a permanent modification only when the bank exercised its unbridled discretion to put a Modification Agreement in the mail. In short, Wells Fargo's interpretation of the qualifying language in section 2 turns an otherwise straightforward offer into an illusion.
>
> The more natural interpretation is to read the provision as saying that no permanent modification existed "unless and until" Wigod (i) met all conditions, (ii) Wells Fargo executed the Modification Agreement, and (iii) the effective modification date passed. Before these conditions were met, the loan documents remained unmodified and in force, but under paragraph 1 and section 3 of the TPP, Wells Fargo still had an obligation to offer Wigod a permanent modification once she satisfied all her obligations under the agreement. This interpretation follows from the plain and ordinary meaning of the contract language stating that "the Plan is not a modification ... unless and until" the conditions precedent were fulfilled. TPP § 2.G. And, unlike Wells Fargo's reading, it gives full effect to all of the TPP's provisions.

1   673 F.3d at 563.

2       This Court finds the reasoning of *Wigod* and *Gaudin* to be persuasive and therefore

3   concludes that at the pleading stage, at least, Plaintiffs have sufficiently alleged mutual assent based

4   on the TPP.

5       The Court rejects Wells Fargo's reliance on *Nungaray v. Litton Loan Servicing, LP*, 2011

6   WL 5843092 (Nov. 22, 2011).  There, the court held, on summary judgment that there was "no

7   contract" for a loan modification under the TPP, but its holding appears to have been based on the

8   fact that the borrowers had not complied with the terms of TPP; in particular, they failed to provide

9   the required financial information, resulting in the return of two of four modified payments and

10  cancellation of the trial plan.  *Id.* at 1504-1505.  As a result, that case is distinguishable.

11              **ii.       Whether Contractual Terms Are Sufficiently Definite**

12      "Under California law, a contract will be enforced if it is sufficiently definite . . . for the

13  court to ascertain the parties' obligations and to determine whether those obligations have been

14  performed or breached." *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 623  (1991).

15  Conversely, a contract is void and unenforceable where a contract is so uncertain and indefinite that

16  the intention of the parties on material questions cannot be ascertained.  *Ladas v. California State*

17  *Auto. Ass'n*, 19  Cal.App.4th 761, 770 (1993).   Typically, where a contract involves a loan it should

18  include the identity of the lender and borrower, the amount of the loan, and the terms for repayment

19  in order to be sufficiently definite.  *Peterson Development Co. v. Torrey Pines Bank*, 233

20  Cal.App.3d 103, 115 (1991).  The California Supreme Court has cautioned, however, that the

21  destruction of contracts on the basis of indefiniteness is disfavored and therefore, courts should, if

22  feasible, "construe agreements as to carry into effect the reasonable intentions of the parties if [they]

23  can be ascertained."  *Patel v. Liebermensch*, 45 Cal.4th 344, 369 (2008) (citations omitted).

24      Wells Fargo contends that the TPP cannot give rise to an enforceable contract because it does

25  not set forth the repayment terms that would apply to the modified loan and therefore it is indefinite.

26  The Court disagrees.  As the court explained in *Wigod*, while the TPP did not set forth the specific

27  terms of repayment, Wells Fargo was required to offer a modification that was consistent with

28  HAMP guidelines and therefore, the agreement did not give Wells Fargo unlimited discretion as to

**United States District Court**
For the Northern District of California

26

**United States District Court**

For the Northern District of California

1   the repayment terms. *Wigod*, 673 F.3d at 565. Therefore, the *Wigod* court concluded that the TPP

2   was sufficiently definite for a contract to exist. *Id.* Similarly, the courts in *In re Ossman*, 2012 WL

3   315485, at *3, and *Turbeville*, 2011 WL 7163111, at *4, found that the TPP was not indefinite to

4   the extent that the terms of the modification had to be calculated consistent with HAMP guidelines.

5   Because Wells Fargo was required to comply with HAMP guidelines in determining the terms of

6   repayment under a modification agreement, the Court concludes, at least at the pleading stage, that

7   the terms of the TPP are sufficiently definite to support the existence of a contract.

8                    **iii.        Whether the Contract is Supported by Consideration**

9          Under California law, "good consideration" to support a contract is defined as follows:

10          Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to
            which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be
11          suffered, by such person, other than such as he is at the time of consent lawfully bound to
            suffer, as an inducement to the promisor, is a good consideration for a promise.
12

13   Cal. Civ. Code Section 1605. Doing or promising to do what one is already legally bound to do

14   cannot be consideration for a promise. *Witkin, Summary of California Law* 10th (2005) Contracts §

15   218. On the other hand, "[u]nder California law, consideration exists even if the performance due

16   "'consists almost wholly of a performance that is already required and that this performance is the

17   main object of the promisor's desire. It is enough that some small additional performance is

18   bargained for and given. .. . [It is sufficient] if the act or forebearance given or promised as

19   consideration differs in any way from what was previously due." *Ansanelli v. JP Morgan Chase*

20   *Bank, N.A.*, 2011 WL 1134451, at *4 (quoting *House v. Lala*, 214 Cal.App.2d 238, 243(1963)).

21   Thus, in *Ansanelli*, the Court held that the additional time spent preparing the disclosures that were

22   required under the trial payment plan – which were not required under the original loan – was

23   adequate consideration to support the existence of a contract. *Id.* Likewise, the Seventh Circuit in

24   *Wigod* found that the TPP was supported by consideration because the borrower agreed to "open

25   new escrow accounts, to undergo credit counseling (if asked), and to provide and vouch for the truth

26   of her financial information." 673 F.3d at 564.

27          Here, as in *Wigod* and *Ansanelli,* Plaintiffs' allegations are sufficient to show that their

28   promise was supported by consideration to the extent that they were required to submit financial

1   documents that were not required under the original loan.  Plaintiffs also agreed to go to credit

2   counseling if asked to do so.  Accordingly, Plaintiffs have adequately alleged consideration to

3   survive a motion to dismiss.

4

5   **b.      Whether the Breach of Contract Claim Fails because no Cognizable Damages have been Alleged**

6         Wells Fargo asserts that the only alleged damages are the reduced payments Plaintiffs made

7   under the TPP and that these do not constitute damages because Plaintiffs had a preexisting duty to

8   make payments on their loan.  The Court agrees.  However, Plaintiffs represented at oral argument

9   that they can amend their complaint to allege that they have suffered other types of damages,

10  including adverse credit consequences in an increase in the principal amount owed on the loan, as a

11  result of Wells Fargo's failure to offer them a permanent modification upon the successful

12  completion of the TPP.  Such allegations would sufficiently allege damages to support Plaintiffs'

13  breach of contract claim.  *See Wigod*, 673 F.3d at 18 (rejecting trial court's conclusion that the

14  plaintiff had not shown any pecuniary loss and pointing to the plaintiff's allegations that she

15  "incurred costs and fees, lost other opportunities to save her home [and] suffered a negative impact

16  to her credit").  Therefore, Plaintiffs shall be permitted to amend their complaint to allege damages,

17  other than the payments themselves, that resulted from Wells Fargo's alleged breach of contract.

18  **E.      Whether State Law Claims Can be Asserted in Connection with HAMP**

19        Wells Fargo contends that Plaintiffs' claims are an impermissible attempt to enforce the

20  HAMP guidelines under state law, even though HAMP does not provide a private right of action.

21  Numerous courts have rejected this argument and so does this Court.  *See, e.g., Wigod v. Wells*

22  *Fargo Bank,* 637 F.3d at 581-582 ("The end-run theory is built on the novel assumption that where

23  Congress does not create a private right of action for violation of a federal law, no right of action

24  may exist under state law, either");  *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805, at * 4

25  (W.D.Mich., Aug. 25, 2011)("a state-law breach of contract claim [is] not preempted or *otherwise*

26  *generally precluded by HAMP");  Belyea v. Litton Loan Servicing, LLP,* 2011 WL 2884964, at *8

27  (D. Mass. July 15, 2011) ("Plaintiffs' claims rest on the theory that the TPP Agreements entered into

28  by Litton and the Plaintiffs constitute binding contracts and that Litton breached those contracts.

United States District Court
For the Northern District of California

1    Accordingly, the Plaintiffs' claims arise exclusively under state contract law and related state law

2    doctrines, not under HAMP or any other federal law"); *Bosque v. Wells Fargo Bank, N.A.*, 762 F.

3    Supp. 2d 342, 350 (D. Mass. 2011) ("Whether HAMP creates a private right of action or a

4    cognizable property interest is not the issue in this case. Plaintiffs have brought suit on the theory

5    that the TPP constituted a contract between defendant and plaintiffs, and that defendant breached

6    that contract.  Their claims arise under defendant's alleged failure to comply with its contractual

7    obligations in the TPPs").

8         In *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, the

9    court explained why Wells Fargo's "end-run" argument fails:

10        Defendants . . . contend that because there is no private right of action under HAMP,
          plaintiffs' common law causes of action are foreclosed. Several courts have rejected this
11        reasoning. *See Bosque v. Wells Fargo Bank, N.A.*, No. 10–cv–10311–FDS, 2011 WL
          304725, *5 (D.Mass.2011) and *Durmic v. J.P. Morgan Chase Bank, N.A.*, No.
12        10–cv–10380–RGS, 2010 WL 4825632, *2 n. 9 (D.Mass. Nov. 24, 2010). Nor is the
          Supreme Court's recent decision in *Astra USA, Inc. v. Santa Clara County*, ––– U.S. ––––,
13        131 S.Ct. 1342, 1347–1348 (Mar. 29, 2011), to the contrary. In that case, the court held that
          plaintiffs could not bring a breach of contract claim where the contracts at issue were created
14        pursuant to a statutorily-created federal program. The court's reasoning in *Astr*a turned on
          the fact that the contracts incorporated the statutory language. Here, however, no such
15        incorporation occurred, as the HAMP statute contained no direction as to how the program
          was to be implemented. The TPPs, not the statute, supplied the contractual provision
16        allegedly breached, namely the borrower would be admitted into the HAMP if he or she
          complied with the TPP and his or her representations remained accurate.

17

18    2011 WL2637222, at * 3 n. 4 (D. Mass. July 6, 2011).  The Court finds this reasoning persuasive.

19        The cases cited by Wells Fargo do not support a contrary result.  First, both the trial court's

20    decision in *Wigod*, 2011 WL 250501, at *4-5 (N.D. Ill. Jan. 25, 2011) and the court in *Stolba v.*

21    *Wells Fargo & Co.*, 2011 WL 4333078, at * 3 (D.N.J. Aug. 8, 2011) found that the TPP was not a

22    contract and therefore, those cases simply stand for the proposition that there is no private right of

23    action to enforce HAMP.  Further, even aside from the fact that the trial court's decision in *Wigod*

24    has now been overruled, the Court does not find the reasoning of these decisions to be correct, for

25    the reasons stated above.  *Cox v. Mortgage Electronic Registration Systems, Inc.*, 794 F. Supp. 2d

26    1060 (D. Minn. 2011) is distinguishable because the plaintiffs did not assert a breach of contract

27    claim in that case.  Likewise, in *Baltazar v. Premium Capital Funding*, 2011 WL 3841450, at *2-3

28    (D. Utah Aug. 26, 2011), the only contract alleged was between the lender and the federal

1    government and under these circumstances, the court concluded that the plaintiffs claims were

2    "nothing more than disguised HAMP claims."

3        Therefore, the Court rejects Wells Fargo's contention that Plaintiffs' claims are barred

4    because they constitute an "end-run" around HAMP.

5        **F.      Whether Plaintiffs' Claims are Preempted by the National Bank Act**

6        Wells Fargo asserts that Plaintiffs' state law claims substantially interfere with its ability to

7    service residential mortgage loans and therefore, that their claims are preempted under the National

8    Bank Act ("NBA"), and its implementing regulations.  Pursuant to the National Banking Act,

9    Congress vested the national banks with certain enumerated powers, as "shall be necessary to carry

10   on the business of banking," including the power to engage in mortgage lending.  *See* 12 U.S.C. §§

11   24, 371(a).  Under 12 C.F.R. § 34.4(a), "state laws that obstruct, impair, or condition a national

12   bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to

13   national banks."  In particular, "a national bank may make real estate loans under 12 U.S.C. 371 and

14   § 34.3, without regard to state law limitations concerning . . . [p]rocessing, origination, servicing,

15   sale or purchase of, or investment or participation in, mortgages."  However, "[f]ederally chartered

16   banks are subject to state laws of general application in the daily business to the extent such laws do

17   not conflict with the letter or the general purposes of the [NBA]."  *Watters v. Wachovia Bank, N.A.*,

18   550 U.S. 1, 6 (2007).

19       The Court concludes that the particular claims made in this matter are not preempted because

20   they are based on state laws of general application.  *See Lucia*, 798 F. Supp. 2d at 1066 (citing

21   *Winding v. Cal–Western Reconveyance Corp.*, 2011 WL 221321, *12 (E.D.Cal. Jan. 24, 2011);

22   *Khan v. World Savings Bank, FSB*, 2011 WL 133030, *4 (N.D.Cal. Jan. 14, 2011); *Gens v.

23   Wachovia Mortgage Corp.*, 2011 WL 9121, *9 (N.D.Cal. Jan. 3, 2011).   Therefore, the Court

24   declines to dismiss Plaintiffs' claims on the grounds of NBA preemption.

25

26

27

28

**United States District Court**
For the Northern District of California

1   **IV.    CONCLUSION**

2        For the reasons stated above, Defendant's Motion is GRANTED in part and DENIED in part

3   as follows: the Motion is GRANTED as to 1) Plaintiffs' UCL claim (Claim One) to the extent it is

4   based on alleged violation of the FDCPA;  2) Plaintiffs' claim for breach of contract (Claim Two),

5   on the basis that Plaintiffs have failed to allege cognizable damages; and 3) Plaintiffs' claim for

6   Rescission/Restitution (Claim Three), which Plaintiffs have stipulated is moot.  In all other respects,

7   the Motion is DENIED.  Plaintiffs shall be permitted to amend their complaint to allege, if they can,

8   damages arising out of Defendant's alleged breach of contract.  No other amendments shall be

9   permitted.  An amended complaint shall be filed within thirty (30) days of the date of this order.

10       IT IS SO ORDERED.

11

12  Dated: May 9, 2012

13  _____

14  JOSEPH C. SPERO
    United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28